956 A.2d 406

COMMONWEALTH of Pennsylvania, Appellee

v.

Gregory POWELL, Appellant.

Supreme Court of Pennsylvania.

Submitted May 14, 2007.

Decided Sept. 24, 2008.

228

Daniel A. Rendine, Esq., Rendine & McConeghy, for Gregory Powell.

Amy Zapp, Esq., Hugh J. Burns, Jr., Esq., Anthony V. Pomerany, Philadelphia District Attorney's Office, for Commonwealth of Pennsylvania.

BEFORE: CASTILLE, C.J., and SAYLOR, EAKIN, BAER, TODD, McCAFFERY, GREENSPAN, JJ.

## OPINION

Chief Justice CASTILLE.

This is a direct appeal from a sentence of death imposed by the Philadelphia County Court of Common Pleas on November 28, 2000, for the beating death of six-year-old Raymond

Graves. Appellant Gregory Powell was convicted of first-degree murder[1] and endangering the welfare of a child[2] following a capital murder trial that commenced on October 31, 2000. Because we find the issues raised by appellant either to be without merit or unreviewable, we affirm the convictions and judgment of sentence.

Evidence adduced at trial established the following. Raymond Graves was born on November 12, 1991, the son of Desiree Graves, with whom appellant had an ongoing relationship for a number of years that included periods of cohabitation. Whether or not Raymond was appellant's biological child was disputed at trial; however, it was undisputed that appellant's name appears on Raymond's birth certificate as his father, that Raymond knew appellant as his father, and that appellant held out Raymond as his biological son. Raymond lived with his mother or his maternal grandmother for the majority of his life, but appellant obtained custody of Raymond in 1997, while Desiree Graves was in a residential treatment program for addictions to cocaine and alcohol. After appellant obtained custody, Raymond was exclusively under his care and control, seeing his mother on only a few occasions before his death.

Appellant and Raymond resided at 3021 West Susquehanna Avenue in Philadelphia, on the first floor of the building. A neighbor, Clarence Lee, who lived in the second floor rear apartment of the building, often saw Raymond and appellant, and had regular access to their apartment to spray insecticides. According to Lee, the apartment was always neat and clean, but he often noticed that Raymond had dark circles around his eyes and that he "appeared frail." Notes of Testimony ("N.T."), 11/13/00, at 100, 102–03. At least twice a week during the nine to twelve months leading up to the murder, Lee heard appellant cursing and yelling at Raymond that he had told him time and time again not to do things and to "shut the fuck up." Id. at 62–88. Lee heard furniture being knocked over or pushed about, the sound of blows, and

1. 18 Pa.C.S. § 2502(a).

2. 18 Pa.C.S. § 4304.

Raymond crying and pleading with appellant to stop. While Lee never spoke with appellant about what he heard, he did call the police and the Department of Human Services to report the abuse. The police came to investigate, but at the time, they found nothing amiss and they left. *Id.* at 107–09, 113, 116–23.

Because appellant worked evenings, Raymond was cared for in his paternal grandmother's home by his grandmother and uncle from after school until approximately 11:00 p.m. on school days, after which appellant would pick him up and take him home. Appellant's brother, Tyrone Powell, lived four blocks from appellant's mother and saw Raymond frequently. Tyrone noticed that Raymond was frequently bruised or injured, and later said that both he and his mother were "suspicious" of Raymond's myriad wounds. Less than a month before Raymond was murdered, Tyrone noticed that he had a large knot on his forehead that lasted two to three weeks, as well as a black eye. A week before the murder, Tyrone touched Raymond on his sides and Raymond moaned and said that his sides were sore. Tyrone later stated that the shape of Raymond's face had actually begun to change from the frequent injuries, and had started to look "like a prizefighter's face that had been in a lot of fights[,] like someone had been beat[ing] on it a lot." N.T., 11/13/00, at 70, 79–80, 86–92, 95, 97; N.T., 11/15/00, at 15.

Other than appellant's mother and brother, few people ever saw or spoke with Raymond outside of appellant's presence. Raymond saw his biological mother only three times between March and November 1997. While Desiree Graves asked appellant to allow her to see Raymond on other occasions, appellant claimed that Raymond was sick or that he did not have time to bring him for a visit. Appellant walked Raymond to school every morning and Raymond's teacher remembers a polite and friendly child with a nice smile; however, for several weeks before Raymond's death, he did not attend school. Olivia Gilbert, an acquaintance of appellant's, saw Raymond several times during the month-long period leading to his death, but appellant would not allow her to see Ray-

mond outside of his presence and would not allow Raymond to play with Gilbert's children. Gilbert testified that at one time, she went to Raymond's room to talk with him and appellant followed her and did not allow Raymond to speak for himself. Appellant told her that Raymond did not appreciate what appellant was doing for him, that he "always wanted his way," and that once, when Raymond had asked for a glass of water but then drank very little of it, appellant threw the rest of the water into the six-year-old's face. When Gilbert asked why, appellant explained that after that incident, Raymond "never did it again." N.T., 11/13/00, at 157–58. She also noticed that during the month before his death Raymond was always sick, and that the day before he died he had a large lump on his forehead. Appellant told her that Raymond was clumsy and fell a lot.

Events the night of Raymond's murder unfolded as follows. At some point in the evening of November 20, 1997, appellant called his mother's house, spoke with his brother, Tyrone, and told him that Raymond had hit his head on the wall and would not wake up. Leaving Raymond at his apartment, appellant then went to his mother's house and told his mother and brother that he could not wake Raymond up, and that Raymond had been playing when he ran into the wall. Appellant called 911 from his mother's house.

At approximately 11:00 p.m., Philadelphia Firefighters Lance Marshall and Richard Jones, serving on collateral duty as EMS personnel, were summoned to appellant's apartment. They arrived to find the building dark and vacant. They were unable to gain entry, but appellant then appeared and approached them. When appellant informed Marshall and Jones that he had summoned them to the house because something was wrong with his son, the officers detected the odor of alcohol on his breath.

Appellant let the firefighters into his apartment, where Raymond was lying on the sofa covered with a blanket. From the color of Raymond's skin, Officer Marshall could immediately tell that he was dead. When asked what had happened, appellant said that Raymond had fallen in the bathtub and hit

his head at approximately 9:00 p.m. that night. Marshall saw no head wounds on Raymond, but did observe bruising on his chest and abdomen. When Marshall asked appellant why he waited so long to call 911, appellant did not respond. Raymond was then transported to the Medical College of Philadelphia, where he was pronounced dead upon arrival.

The doctor who examined Raymond's body reported that the bruises observed by Marshall were "suspicious," and Police Officer William McNeil was summoned to the hospital. Officer McNeil spoke with appellant in the waiting room of the hospital, and appellant told him that Raymond had been running in the house, fell, and hit his head. Appellant said that Raymond was in and out of consciousness after the head injury, and that he tried to perform CPR. Appellant stated that Raymond was still breathing when he put him down to sleep on the couch, and that after putting Raymond down, he went to sleep himself. When he woke, appellant claimed that Raymond had stopped breathing, so he called 911. According to Officer McNeil, appellant's manner was nervous and distracted.

Appellant spoke with several other people while at the hospital or shortly afterwards. Appellant called Olivia Gilbert and told her that he had called Raymond into the kitchen for dinner, and that when Raymond came in, he hit his head on the wall and fell. Appellant said that Raymond would not wake up, so he put cold water in the bathtub and put the child in the tub. When he still did not regain consciousness, appellant gave Raymond mouth-to-mouth resuscitation and then brought him in the living room and placed him on the sofa. When Gilbert asked why appellant did not contact someone or take him to the hospital, appellant stated that "it had happened before" and he had "brought him back." N.T., 11/13/00, at 152. Appellant also told Gilbert that he had gotten high that day, and that if he had not been high, perhaps he could have reacted better.

Appellant also discussed Raymond's death with his neighbor, William Dunson, the day after Raymond's death. Appellant brought two beers over to Dunson's house, gave Dunson

one, and said that he thought he had killed his son. Appellant told Dunson that Raymond "wouldn't shut up," and that he hit Raymond "all night" to get him to stop crying. N.T., 12/22/97, at 28–29. Appellant told Dunson that "every time [Raymond] would cry, he would beat him. Then he would shut up and he would cry again, then he would beat him some more. Then he would cry again, then he stomped him." *Id.* Shortly before leaving, appellant told Dunson, "what's done is done, fuck it." N.T., 11/15/00, at 46. Dunson called the police.

The same day, Police Crime Scene Unit personnel went to appellant's apartment to photograph the scene. Two sections of drywall in the kitchen were caved in. The officers could not determine when the damage had occurred, but there was no plaster dust, which indicated that the damage was not recent.

Appellant was charged with endangering the welfare of a child and first-degree murder. A jury trial commenced on October 31, 2000.[3] At trial, the Commonwealth presented the testimony of Desiree Graves, Gilbert, Tyrone Powell, and Dunson, as well as significant medical testimony. The medical examiner, Dr. Erwin Lieberman, testified that Raymond had "more than ten" fresh injuries, as well as numerous healing injuries and old scars. The new injuries were on the child's head, chest, collarbone, upper back, lower back, elbows, and mouth, including a recently broken tooth. According to the medical examiner, the head and mouth injuries were caused by blunt force trauma with a relatively padded instrument, such as a hand. Additionally, there was extensive hemorrhaging in Raymond's thymus gland, which is located high up on the chest, fluid in Raymond's lungs and traumatic brain injury. The medical examiner explained that the fluid in Raymond's lungs was caused by a seizure, which was brought on by blows to the head. Dr. Lieberman testified that, during the seizure, Raymond would have exhibited involuntary jerking movements, his eyes would have rolled back in his head, and foam

3. The long delay between appellant's arrest and his trial was largely due to appellant's inability to find a lawyer with whom he could get along. Appellant fired four attorneys because of alleged personality conflicts.

would have come from his nose and mouth due to the water building up in his lungs. Dr. Lieberman testified that the manner of death was multiple blunt force injuries and that the cause of death was homicide. N.T., 11/14/00, p. 23. Dr. Lieberman also stated that the injuries Raymond sustained would have killed not just a small child, but also "an 18–year–old or a 40–year–old." N.T., 11/14/00, at 54.

A neuropathologist, Dr. Lucy B. Rorke, examined Raymond's brain, spine, and eyes, and found both acute injuries (inflicted within twelve to twenty-four hours of death) and older injuries. The oldest brain injuries were "several months old." N.T., 11/14/00, at 74. Dr. Rorke testified that there were hemorrhages in Raymond's eyes, as well as under and along the membranes that cover the brain. Some of the hemorrhages had been present for some time, while there was also acute bleeding in the brain, blood clots, and evidence of oxygen deprivation. Dr. Rorke also testified that fluid in Raymond's brain was stained with blood, and that there was bleeding in his spinal cord that was several weeks old. She noted that Raymond's brain displayed evidence of acute oxygen deprivation. Dr. Rorke testified that all the injuries she described were typically secondary to trauma, of a type commonly found in battered and traumatized infants. Although the injuries were not externally apparent, Dr. Rorke added that the older retinal hemorrhaging could have been detected had a doctor looked into Raymond's eyes. The recent injuries were detectable only during autopsy. *Id.* at 68

In his defense, appellant presented the testimony of his mother, Daisy Mae Powell, his landlord, Raymond's kindergarten teacher, a family friend, a school crossing guard, appellant's work supervisor who had met Raymond on a few occasions, and Raymond's primary care physician, all of whom testified that they never noticed any signs of abuse and that Raymond appeared to be a happy and normal child. However, Raymond's kindergarten teacher also testified that Raymond had not been in school for over a week before his death.

At the close of evidence, the trial court charged the jury on first- and third-degree murder, and endangering the welfare

of a child. During deliberations, the jury submitted a question to the trial court regarding the intent requirement for first-degree murder, which the trial court answered. Appellant was found guilty of first-degree murder and endangering the welfare of a child.

The penalty phase began on November 27, 2000. The Commonwealth incorporated the trial evidence, while appellant testified on his own behalf and presented the testimony of his mother and his brother, Alonzo Powell. The Commonwealth submitted three aggravating factors to the jury: (1) that the victim was under twelve years of age;[1] (2) that the offense was committed by means of torture;[5] and (3) that appellant had a significant history of felony convictions involving the use or threat of violence to the person.[6] Three mitigating circumstances were also presented: (1) that appellant was under the influence of extreme mental or emotional disturbance;[7] (2) the capacity of appellant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired;[8] and (3) the catchall mitigator.[9] The jury found all three aggravating circumstances, and wrote in as a mitigating circumstance, "mercy." *See* First–Degree Murder Sentencing Verdict Slip, 11/28/00. The jury concluded that the aggravating circumstances outweighed the non-statutory mitigating circumstance, and, accordingly, returned a verdict of death for appellant's first-degree murder conviction. Appellant filed a motion in arrest of judgment and for a new trial. At that time, appellant's original counsel was permitted to withdraw, and new counsel was appointed. The motion in arrest of judgment and for a new trial was denied, and defendant was formally sentenced to death for murder, and to three and one-half to

4. 42 Pa.C.S. § 9711(d)(16).
5. 42 Pa.C.S. § 9711(d)(8).
6. 42 Pa.C.S. § 9711(d)(9).
7. 42 Pa.C.S. § 9711(e)(2).
8. 42 Pa.C.S. § 9711(e)(3).
9. 42 Pa.C.S. § 9711(e)(8).

seven years' incarceration for endangering the welfare of a child, to be served concurrently. A second post-sentence motion was filed on May 29, 2001, and denied. This appeal followed.[10]

## I. Sufficiency of the Evidence[11]

Appellant claims that the evidence was insufficient to support his first-degree murder conviction, arguing that the Commonwealth failed to prove that he had a specific intent to kill.[12] When reviewing the sufficiency of the evidence, this Court must determine whether the evidence at trial, and all reasonable inferences derived therefrom, when viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to establish all elements of the offense beyond a reasonable doubt. *Commonwealth v. Bridges*, 563 Pa. 1, 757 A.2d 859, 864 (2000). Evidence is sufficient to sustain a conviction for first-degree murder where the Commonwealth establishes that: (1) a human being was unlawfully killed; (2) the person accused is responsible for the killing; and (3) the accused acted with the specific intent to kill. 18 Pa.C.S. § 2502(d); *Commonwealth v. Spotz*, 563 Pa. 269, 759 A.2d 1280, 1283 (2000). An intentional killing is a killing carried out "by means of poison, or by lying in wait, or by any other kind of willful, deliberate, and premeditated killing." 18 Pa. C.S. § 2502(d). The Commonwealth may establish that the defendant intentionally killed another human being wholly through circumstantial evidence. *Commonwealth v. Rivera*, 565 Pa. 289, 773 A.2d 131, 135 (2001), *cert. denied*, 535 U.S. 955, 122 S.Ct. 1360, 152 L.Ed.2d 355 (2002).

10. Pursuant to 42 Pa.C.S. § 9711(h), this Court has automatic jurisdiction to review the trial court's judgment of sentence of death.

11. It is this Court's practice, in all death penalty direct appeals, to review the evidence to ensure that it is sufficient to support the first-degree murder conviction regardless of whether the appellant raises a sufficiency challenge. *Commonwealth v. DeJesus*, 580 Pa. 303, 860 A.2d 102, 105 (2004); *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937, 942 n. 3 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). Here, appellant raises a sufficiency challenge.

12. Appellant does not challenge his conviction for endangering the welfare of a child.

Appellant reviews the testimony of the Commonwealth's witnesses, and then individually argues that the testimony of each witness, standing alone, does not give rise to a reasonable inference of a specific intent to kill. For example, appellant argues that the testimony of Officer Marshall established only that Raymond was dead upon his arrival, and that appellant told the firefighters that Raymond had fallen in the bathtub and hit his head. Appellant concludes that this testimony cannot give rise to the inference that appellant intentionally killed Raymond. Next, appellant casts the testimony of Desiree Graves, Tyrone Powell, Olivia Gilbert, and Clarence Lee, his neighbor, in a light more favorable to himself, arguing that their collective testimony established only the possibility that there was a history of his "minor" abuse of Raymond. Appellant asserts that this history of "minor abuse," standing alone, cannot give rise to the inference of specific intent to kill. Finally, while appellant acknowledges that he told his neighbor William Dunson what he did to Raymond, he argues that, even accepting this statement as true, it cannot be inferred from this statement that appellant acted with the specific intent to kill Raymond.

Next, appellant introduces an argument that he will repeatedly weave throughout his ensuing claims: that the medical evidence is insufficient to sustain the first-degree murder conviction because the evidence did not show that there was any "final incident, any final blow, which was the cause of death." Appellant repeatedly refers to what he calls "non-lethal" blows, and points out that Dr. Lieberman, the medical examiner who performed the autopsy, testified that the actual cause of death was asphyxiation due to water buildup in Raymond's lungs caused by a seizure, to which Raymond was predisposed because of "prior injuries." Appellant's Brief at 26.[13]

13. While appellant does not acknowledge the fact, the medical testimony established that these prior injuries (including the hemorrhaging in Raymond's brain) were a result of the "minor abuse" and "non-lethal injuries" appellant previously inflicted on his son.

Appellant's latter argument essentially boils down to the novel proposition that, in order to infer an intent to kill, the jury must be presented with a specific single event that causes the death. In this case, appellant argues that the final beating that killed Raymond is not such an event, because the medical testimony did not establish that there was a single, specific "killing" blow. According to appellant, his history of abusing Raymond and the myriad acute injuries Raymond suffered actually **negates** a finding of specific intent to kill, because if appellant "wanted to kill this child it would have been easy for him to do so." Appellant's Brief at 28. Appellant also argues that *Commonwealth v. Terry,* 513 Pa. 381, 521 A.2d 398 (1987), establishes a heightened evidentiary standard for a finding of intent when a killing is committed by blunt-force trauma.

In response, the Commonwealth points out that, despite appellant's repeated talk of "non-lethal injuries," there is no question that appellant caused Raymond's death. In fact, appellant specifically requested that the trial judge inform the jury that he accepted responsibility for doing so. Further, the Commonwealth cites to Dr. Lieberman's expert testimony that Raymond died of multiple blunt-force injuries, and argues that the fact that Raymond was weaker on the day of the final beating than he would have been without the history of prior abuse does not negate a finding of the specific intent to kill as a matter of law.

In response to appellant's argument that there could be no specific intent to kill because there was no "final blow," the Commonwealth analogizes the instant case to *Commonwealth v. Tharp,* 574 Pa. 202, 830 A.2d 519, 526–31 (2003), where the defendant was found guilty of first-degree murder for starving her daughter to death over a prolonged period of time. The Commonwealth also notes, on the other hand, that the intent to kill can arise in a fraction of a second. *See Commonwealth v. Fisher,* 564 Pa. 505, 769 A.2d 1116, 1124 (2001). Thus, the fact that appellant did not kill the child before the night in question, though he easily could have, does not mean that he lacked an intent to kill Raymond on the night he succeeded. Finally, in response to appellant's suggestion that this Court

traditionally requires "greater force" in blunt-force trauma cases to uphold a finding of first-degree murder, the Commonwealth notes that the fact that this Court has held such "greater" facts sufficient in other cases does not mean that allegedly lesser force is insufficient. Commonwealth's Brief at 23 n. 22.

The trial court found that the evidence presented "overwhelmingly" supported the conviction. The trial court noted that the jury clearly accepted that Raymond's injuries were inflicted by appellant, and that those injuries were extensive and serious enough to allow the jury to infer an intent to kill. *See* Trial Ct. Op. at 16–17 (citing *Commonwealth v. Paquette*, 451 Pa. 250, 301 A.2d 837 (1973) (specific intent to kill can be inferred from surrounding circumstances, such as severity and type of injuries)). We agree. The extensive physical injuries appellant inflicted on the child, his cold-hearted failure to timely seek medical assistance, and the contradictory explanations appellant offered as to how Raymond sustained his injuries, including his admission to Dunson, were sufficient to support the inference that appellant intentionally caused the child's death. The evidence, when viewed in the light most favorable to the Commonwealth as verdict winner, was sufficient to permit the jury to conclude, beyond a reasonable doubt, that appellant intentionally, deliberately, and with premeditation killed Raymond Graves. Appellant capped a sustained period of abuse by beating a helpless, six-year-old child to death. The injuries inflicted were brutal: both the prior beatings and the beating that finally caused the child's death. The injuries were enough, an expert said, to kill an adult. Appellant was of course free to argue to the jury that he was too obtuse to realize the damage he was doing when he "stomped on Raymond" and beat him so as to cause not only invisible brain damage and spinal hemorrhaging, but visible seizures and fresh injuries to the child's head, chest, collarbone, back, elbow, and mouth. But the jury was not obliged to believe such a claim.

Appellant's suggestion that the jury could not properly find specific intent because Raymond was killed by a prolonged

beating, rather than by a single blow, lacks merit. Appellant repeatedly references the "non-lethal" injuries that he inflicted upon Raymond. This is a curious turn of phrase, considering that the six-year-old child is dead as a result of the injuries. There is nothing in the law, logic, or human experience that provides, as a matter of law, that specific intent cannot be found when the medical examiner cannot point to a specific blow as the definitive cause of death. The very personal nature of a beating such as this negates the notion that a specifically identifiable killing blow is required to prove specific intent. After each beating, indeed, after each blow, appellant had time to reflect on what he was doing to his son. And, with the final "stomping" he administered to various vital parts of the child's body, appellant had ample time to appreciate the lethality of his conduct. The jury acted well within its authority in finding specific intent. Nor does the fact that Raymond could possibly have survived the final, hours-long beating without the damage inflicted by the prior abuse negate a finding of intent.

Further, we agree with the Commonwealth that appellant's "final event" argument is meritless in light of this Court's decision in *Commonwealth v. Tharp*, 574 Pa. 202, 830 A.2d 519 (2003). In *Tharp*, we found that a verdict of first-degree murder was amply supported by evidence that the appellant had starved her daughter to death over a long period of time. *Id.* at 527. In *Tharp*, there was no "final undelivered meal"— just as there was no one blow here—that definitively caused the child's death, but rather an accumulation of abuse that gave rise to complications that resulted in death. In *Tharp*, the victim died from complications due to starvation. Here, Raymond died of asphyxiation after repeated blows to the head damaged his brain and caused a seizure that flooded his lungs with fluid. The *Tharp* Court determined that, in bringing about her daughter's death by a prolonged course of action rather than by a single act, the appellant there exhibited not a lack of specific intent, but a "unique type of coldness and deliberation." *Id.* Indeed, that the appellant's starving her daughter despite the ample time for reflection and reconsider-

ation "reveals the sort of premeditation and deliberation that separates first degree murder from other killings." *Id.*

We stated in *Tharp* that "this case is unusual in that death was not brought about by a single act." *Id.* This case is similar, albeit it involves deliberate action rather than inaction. While the victim in *Tharp* was starved to death over a seven-year period of time, and Raymond was beaten to death over the course of twelve to twenty-four hours (or, viewed more broadly, over the course of several months), both circumstances display a "unique type of coldness and deliberation." *Id.* The lack of a single gunshot wound to the head does not negate a finding that a defendant intended to bring about the death of his or her helpless child. Accordingly, no relief is due.[14]

## II. Prior Bad Acts Evidence

Appellant next claims that the trial court improperly permitted Commonwealth witnesses to testify to specific prior bad acts committed by appellant, including unrelated crimes and a prior incarceration. Appellant objects to twelve specific statements made by various witnesses, claiming that those statements individually and collectively prejudiced him at trial. In addition, appellant separately claims that the trial court erred in its response to his objection to the testimony of his brother, Tyrone Powell, concerning appellant's prior incarceration.

—A—

The twelve statements include: Desiree Graves' testimony that appellant: (1) put his hands on her, N.T., 11/13/00, at 69; (2) cursed at her, followed her around, and was abusive, *Id.* at 70; (3) tried to steal her money and burned her with an iron, *Id.* at 89, 90; (4) knocked her into a closet door, *Id.* at 90; (5)

14. Before turning to appellant's other claims of error, we note that we are aware of the Commonwealth's argument that all such claims are waived because appellant's statement of matters complained of on appeal, *see* Pa.R.A.P.1925, was untimely filed. After reviewing appellant's reply brief and attachments, and considering subsequent events, we are satisfied that the claims are properly before us.

Clarence Lee's testimony that appellant was a loud and abusive person, *Id.* at 107; (6) Olivia Gilbert's statements that appellant had a cold personality, *Id.* at 149; and (7) once threw water in Raymond's face, *Id.* at 157. Appellant also objects to Olivia Gilbert's statement that: (8) appellant never hugged or talked to Raymond, N.T., 11/14/00, at 148, and statements made by his brother, Tyrone Powell, that: (9) appellant threw a sandwich at Tyrone when they were younger, *Id.* at 91; and that (10) appellant had gotten so mad he could kill someone, *Id.* at 103. Finally, appellant objects to (11) the Commonwealth's question regarding appellant's reaction to his name not being in Raymond's obituary, *Id.* at 103, and (12) William Dunson's statement that appellant hollered at his girlfriend. N.T., 11/15/00, at 21. Appellant asserts that the cumulative effect of this testimony was to "create a [pervasive] feeling against [appellant] and arouse the passions and prejudices of the jury ... [making] it impossible for the jury to render a fair verdict." Appellant's Brief at 30.

The Commonwealth responds that appellant failed to object to nine of the twelve statements that he now contends were troublesome, and thus those complaints are waived. According to the Commonwealth, appellant timely objected only to the first, sixth, and seventh statements above, *i.e.*, Graves' testimony that appellant "put his hands on her," Gilbert's testimony regarding appellant's "cold" nature, and Gilbert's testimony that appellant told her he once threw a glass of water in Raymond's face. N.T., 11/13/00, at 69, 148–49, 157. Examining these three statements only, the Commonwealth asserts that the trial court did not abuse its discretion because they were all relevant to show the relationship between the parties.

The trial court did not address the challenged statements individually, but simply noted that appellant had listed a "plethora" of Graves' statements as "examples" of improper statements that aroused the passions and prejudices of the jury against appellant. Trial Ct. Op. at 24. The trial court found that evidence of appellant's abusive actions towards Graves—the mother of the child victim—were relevant and

admissible because it established the relationship between the parties. The trial court also found that the "challenged testimony" (presumably referring to all of Graves' testimony) comprised an insignificant portion of the trial as a whole (four pages out of a total of 500 pages of transcript), and thus determined that it was unlikely that appellant suffered any prejudice from the statements. Finally, the trial court considered appellant's cross-examination of Graves to have been more than adequate to provide explanation and context for her testimony.

■ A review of the record reveals that the Commonwealth is correct concerning waiver: appellant objected to only three of the twelve contested statements at trial. Accordingly, appellant's claim that the trial court abused its discretion in admitting the remaining nine statements is waived. Pa.R.A.P. 302(a) (absence of contemporaneous objection waives appellate review of claim); *Commonwealth v. May*, 584 Pa. 640, 887 A.2d 750, 758 (2005) *cert. denied*, 549 U.S. 832, 127 S.Ct. 58, 166 L.Ed.2d 54 (2006).

As to the three statements to which appellant timely objected, appellant argues that the statements amount to "prior bad acts evidence." *See* Pa.R.E. 404(b)(1). Appellant maintains that Graves' testimony that appellant "put his hands on her" was evidence that he committed an assault; and that Gilbert's testimony that appellant threw a glass of water in Raymond's face amounted to another assault. Appellant also includes Gilbert's testimony regarding his "cold" nature as an example of a specific bad act or crime. Appellant argues that evidence of prior crimes and specific bad acts is inadmissible when it is used solely to show bad character or the propensity to commit crimes. Pa.R.E. 404(b); *Commonwealth v. Kemp*, 562 Pa. 154, 753 A.2d 1278, 1284 (2000).

■ Rulings on the admissibility of evidence are within the discretion of the trial judge, and such rulings form no basis for a grant of appellate relief absent an abuse of discretion. *Commonwealth v. Reid*, 571 Pa. 1, 811 A.2d 530, 550 (2002). While it is true that evidence of prior crimes and

bad acts is generally inadmissible if offered for the sole purpose of demonstrating the defendant's bad character or criminal propensity, the same evidence may be admissible where relevant for another purpose. Pa.R.E. 404(b)(2); *Kemp*, 753 A.2d at 1284. Examples of other such relevant purposes include showing the defendant's motive in committing the crime on trial, the absence of mistake or accident, a common scheme or design, or to establish identity. Relevant to the instant case, the evidence may also be admitted where the acts were part of a chain or sequence of events that formed the history of the case and were part of its natural development. *Kemp*, 753 A.2d at 1284. Of course, in addition to the relevance requirement, any ruling on the admissibility of evidence is subject to the probative value/prejudicial effect balancing that attends all evidentiary rulings. *See* Pa.R.E. 403; *Commonwealth v. Dollman*, 518 Pa. 86, 541 A.2d 319, 321–22 (1988).

■ Here, the trial court did not err in admitting Graves' statement that appellant "put his hands on her" when he was drunk or high. N.T., 11/13/00, at 69–70. The statement was offered not to show appellant's propensity to crime, but in the context of establishing the family environment and relationships among appellant, Raymond's mother, and Raymond. Considering the isolation in which appellant kept Raymond, this testimony was useful for the jury in understanding how appellant kept away Raymond's mother, the other adult most likely to have noticed the abuse and protected Raymond. Appellant's prior abuse of Raymond's mother (in addition to her testimony regarding her drug abuse and time in rehab) provides context for her later testimony that she took little action when appellant refused to allow her access to her son, or, on those rare occasions when she did see him, to speak with him alone.

■ Gilbert's statement that appellant threw a glass of water in Raymond's face was relevant to help establish the chain of events and pattern of abuse that eventually caused Raymond's head injuries and led to his susceptibility to sei-

zures. *See Commonwealth v. Walker*, 540 Pa. 80, 656 A.2d 90, 98(1995), *cert. denied*, 516 U.S. 854, 116 S.Ct. 156, 133 L.Ed.2d 100 (1995) ("[O]ur courts will allow evidence of prior bad acts where the distinct crime or bad act was part of a chain or sequence of events which formed the history of the case and was part of its natural development.") (internal quotation marks omitted). Given the nature of the injuries Raymond suffered—*i.e.*, injuries inflicted over a long period of time— this evidence was also relevant to show both appellant's intent and malice and the nature of his relationship with his son. *See Commonwealth v. Ulatoski*, 472 Pa. 53, 371 A.2d 186, 190 (1977). This event provides insight into that relationship, which was characterized by appellant's quick temper, anger, and impatience with the characteristics and developmental level of a small child, and helped establish appellant's motive in killing his son: his impatience with and dislike of the child. In addition, however improper such conduct may be, throwing water in a child's face is not necessarily a crime, and the properly-admitted evidence is not prejudicial, especially when compared with the evidence of the physical abuse appellant inflicted upon Raymond.

Finally, as to Gilbert's statement that appellant had a "cold" personality, the record reveals that appellant's objection at trial was sustained and the statement was not admitted into evidence. Appellant does not argue that greater relief than that afforded at trial was required. Thus, this complaint fails.

—B—

■■■ Next, appellant claims that the trial court erred in its response to his objection to Tyrone Powell's testimony that, while appellant had a bad temper when he was younger, he "calmed down after he went to prison." N.T., 11/14/00, at 89– 90. Appellant objected and moved for a mistrial when this statement was made. The trial court sustained the objection, but denied appellant's request for a mistrial. Appellant then requested that a curative instruction be delayed and given during the jury charge. The trial court acceded to this request; however, the trial court failed to give the requested

instruction during its initial jury charge. Notably, however, appellant did not object to the court's failure to give the curative instruction at that time—notwithstanding that, after completing the jury instructions, the trial court specifically asked appellant's counsel if he had anything to add to the instructions. Counsel replied that he did not. However, the trial court *sua sponte* gave the instruction during jury deliberations, when the jury reconvened after submitting a question to the court. Before responding to the jury's question, the trial court, without a request or objection from appellant, instructed the jury to remember that Powell's testimony had been stricken from the record and that the jury could not consider it as evidence.

Appellant now argues that the timing of the curative instruction resulted in it having a detrimental effect. By giving this instruction during jury deliberations, appellant submits, the trial court actually emphasized to the jury that appellant had previously been incarcerated for an unrelated incident. Further, appellant points out that the trial court did not give the curative instruction until after the jury asked a question regarding first-degree murder, which, he suggests, means the jury had already reached a decision regarding appellant's guilt. In such a scenario, appellant suggests that issuing a curative instruction is an exercise in futility at best, and, at worst, a virtual directive from the trial court to find appellant guilty.

In response, the Commonwealth first argues that appellant waived this claim by failing to include it in his Statement of Questions presented, which spoke only to the admissibility of the evidence, and not to the supposed inefficacy of the court's response to the objection. Although the question is indeed framed in an overbroad fashion, given the limitations of the appellate rules in this regard, we do not deem the issue to be waived. On the merits, the Commonwealth notes that the prosecutor did not deliberately elicit the reference: the prosecutor asked only if appellant had had a bad temper all his life, to which Tyrone Powell responded, "[n]o, it calmed down after he went to prison." The Commonwealth also notes that the

trial court sustained appellant's objection, and appellant did not request a mistrial. Instead, appellant sought that ruling only the next day, when the court raised the issue. Even then, appellant forwarded no specific argument as to why the extreme remedy of a mistrial would be warranted in response to the unsolicited remark.

The Commonwealth further notes that, after the trial court denied the motion for mistrial because the remark was unsolicited, appellant did not seek an immediate curative instruction, but instead indicated that he would be satisfied with a curative charge in closing instructions. As for appellant's complaint that the court erred because it failed to give the charge until the jury returned with a question, the Commonwealth notes that appellant failed to object to the absence of the charge in the initial closing instructions, even after the court specifically asked counsel if he had anything to add.

The trial court opined that a mistrial was not warranted because the objection was sustained and a curative instruction issued, albeit later than originally requested. The trial court noted that there is no reason to assume that the jury ignored the trial court's instructions to disregard the statement, and that the statement itself was only minimally prejudicial, consisting of a single sentence to which appellant immediately objected. Therefore, the trial court concluded that appellant was not entitled to relief on this claim.

 We find no abuse of discretion in the trial court's decision below. With respect to appellant's request for a mistrial, it is settled that such an extreme remedy is appropriate only when an incident "is of such a nature that its unavoidable effect is to deprive the appellant of a fair and impartial trial." *Commonwealth v. Montgomery*, 533 Pa. 491, 626 A.2d 109, 113 (1993). In reviewing the trial court's denial of a mistrial, we consider the nature of the reference and whether or not the Commonwealth intentionally elicited the testimony. *See Commonwealth v. Pursell*, 508 Pa. 212, 495 A.2d 183, 192 (1985). Here, the reference was unsolicited, appellant immediately objected, and a prompt ruling sustained

the objection. Trial counsel's own response corroborated the trial court's assessment that the remark was not particularly harmful. Thus, the trial court did not abuse its discretion in denying a mistrial on the basis of this single remark.

 Turning to the timing of the curative charge, we agree with the Commonwealth that appellant cannot now be heard to complain. While the trial court did neglect to issue the curative instruction during its closing instructions as previously agreed, appellant failed to object to the omission, despite the fact that the trial court specifically asked if he had anything to add. Moreover, when the trial court *sua sponte* issued the charge later, appellant again failed to object to the timing. Thus, appellant waived any objection to the later timing of the curative instruction. Pa.R.A.P. 302(a). For these reasons, this claim fails.

### III. Autopsy Photographs

Appellant next claims that he is entitled to a new trial because the trial court erred in admitting certain autopsy photographs into evidence. Appellant objects specifically to the photographs he states are marked C–13, C–14, C–15, C–16, C–17, C–22, and C–23 in the record. Appellant argues that the photographs were "gruesome," particularly C–23, which he states shows Raymond's scalp pulled back from his skull during the autopsy. According to appellant, the evidentiary value of the photographs was minimal, as the Commonwealth could have proved the nature and extent of Raymond's injuries by other means, specifically, "numerous other photographs of the crime scene and the victim," which appellant believes would have been sufficient to show Raymond's injuries. Further, appellant asserts that any slight evidentiary value the photographs may have had could not outweigh the strong likelihood that they would inflame the passions of the jury, rendering them incapable of fairly weighing the evidence.

The Commonwealth argues that appellant's claim is waived because none of the photographs in the certified record bears an identifying exhibit number, and C–23, the only photograph

that appellant describes, is not included in the record at all. The Commonwealth maintains that it is appellant's duty to ensure that all relevant photographs are contained in the record, and that his failure to do so waives his claim. The Commonwealth also argues that appellant's claim is waived because he fails to discuss or describe six of the seven allegedly objectionable photographs, and provides only a cursory description of C–23. In his Reply Brief, appellant does not respond to the Commonwealth's identification of these impediments to appellate review.

The notes of testimony reveal that a total of twelve autopsy photographs were proffered by the Commonwealth. After review, the trial court determined that only seven would be published to the jury, as the court deemed the remaining five potentially upsetting and not sufficiently probative. Presumably, the seven photographs that were published to the jury are the seven photographs to which appellant now objects. Our review reveals that only eleven photographs are included in the record, and none of those photographs bears any identifying marker. Because appellant does not describe six of the seven photographs, it is impossible to determine which of the eleven photographs are the ones to which he currently objects. As appellant fails to identify these photographs in a way that would allow this Court to identify and review them, his claim is waived as to the photographs he identifies as C–13, C–14, C–15, C–16, C–17, and C–22. Thus, appellant's claim is narrowed to the only photograph he sufficiently describes to allow identification, i.e., C–23.

As to photograph C–23, our review of the eleven unmarked photographs in the record leads us to conclude that it is not included in the record, as none of the eleven photographs matches the description given by appellant. It thus appears that the Commonwealth is correct that C–23 is the missing photograph. Because the record does not contain the photograph appellant refers to, we cannot assess his description and claim. An appellate court is "limited to considering only those facts that have been duly certified in the record on

appeal." *Commonwealth v. Williams,* 552 Pa. 451, 715 A.2d 1101, 1103 (1998). The Rules of Appellate Procedure place the burden on the appellant to ensure that the record contains what is necessary to effectuate appellate review, and they provide procedures to address gaps or oversights in the compilation and transmission of the record. *See generally* Pa.R.A.P. Ch. 19. Therefore, appellant's claim as to the photograph he identifies as C–23 is waived.

## IV. Commonwealth's Closing Argument

■ Appellant next claims that a new trial is required because the prosecutor's closing argument was calculated to arouse the "passions and prejudices of the jury" against appellant, which rendered it impossible for the jury to return a fair verdict. Appellant complains that the Commonwealth twice referenced appellant's abuse of Desiree Graves, Raymond's mother, and argues that the Commonwealth unfairly capitalized on the "character assassination" appellant had been subjected to during the course of the trial. In a brief conclusory argument, appellant declares that the "unavoidable effect" of the Commonwealth's comments was to so prejudice the jury that it was impossible for the jury to weigh the evidence in a neutral manner. Appellant acknowledges that trial counsel withdrew an objection to the first reference, and never objected to the second reference. He follows-up this acknowledgement with a statement that he addresses counsel's ineffectiveness later in his brief. Appellant's Brief at 39.

The absence of a contemporaneous objection below constitutes a waiver of appellant's current claim respecting the prosecutor's closing argument. Pa.R.A.P. 302(a); *see also Commonwealth v. Butts,* 495 Pa. 528, 434 A.2d 1216, 1219 (1981) (failure to object during or after summation constitutes waiver of prosecutorial misconduct claim). Therefore, this version of the claim is defaulted. To the extent appellant would raise the claim as one sounding in counsel ineffectiveness, we will address it in our examination of Claim IX, *infra.*

## V. Trial Court's Failure to Charge on Involuntary Manslaughter

Appellant's next claim is based on the trial court's supposed error in failing to issue an involuntary manslaughter instruction while charging the jury. A person is guilty of involuntary manslaughter when, "as a direct result of the doing of an unlawful act in a reckless or grossly negligent manner ... he causes the death of another person." 18 Pa.C.S. § 2504(a). Reiterating the defense theory of the case underlying his sufficiency argument, appellant argues that an involuntary manslaughter instruction was justified because the medical experts "agreed" that Raymond's death was caused by a seizure, and not by appellant's most recent assault on the child. In appellant's view, an involuntary manslaughter charge would have been appropriate because the jury could reasonably have found that appellant engaged in merely reckless, rather than malicious, conduct.

The Commonwealth responds that appellant's claim is waived because he did not request an instruction on involuntary manslaughter. The Commonwealth's waiver argument is correct. Despite being asked by the trial court if he had anything to add at the close of the jury charge, appellant did not request an involuntary manslaughter instruction. *See* N.T., 11/16/00, at 100. Indeed, although appellant fails to acknowledge his waiver in the portion of his brief alleging the trial court error, in Claim IX of the brief—which raises a series of claims of ineffective assistance of counsel—appellant admits the default when he alleges his counsel was ineffective for failing to request a jury charge on involuntary manslaughter. Appellant's Brief at 58. Because appellant did not raise his claim of trial court error below, it is defaulted. Pa.R.A.P. 302(a).

## VI. Jury Instructions Regarding Malice

Next, appellant claims that the trial court erred when it answered a jury question during the guilt phase of the trial. During deliberations, the jury submitted the question: "[i]n committing a crime does total disregard for the outcome of the

victim constitute an intent to kill?" Appellant alleges that the trial court answered this question with a "yes," and that this answer constituted reversible error because the jury's question clearly described the mental state required for a finding of third-degree, not first-degree, murder.

Once again, this claim of trial court error is waived because appellant never objected to the trial court's response. The trial court noted as much in its opinion. In addition, once again, although appellant does not acknowledge the waiver in accusing the trial court of error, he admits it in Claim IX, as he faults trial counsel for failing to object to the response. Appellant's Brief at 59. Because appellant did not raise this claim below, it is defaulted. Pa.R.A.P. 302(a).

## VII. Sufficiency of the Evidence for Torture Aggravator

Turning to appellant's penalty-phase claims, appellant first claims that the trial court erred in submitting the torture aggravator, 42 Pa.C.S. § 9711(d)(8), to the jury because the evidence was insufficient to support the aggravating circumstance. We see no error.

Appellant argues that there was no evidence presented at the guilt phase (which was incorporated at the penalty phase) that supported a finding of torture, because there was "absolutely no evidence produced at trial as to how this murder was committed."[15] Appellant contends that neither Dr. Rorke nor Dr. Lieberman testified that appellant beat Raymond to death, instead characterizing their testimony as establishing that the cause of death was an "accumulation of old injuries" that "may" have been exacerbated by the injuries inflicted on the night of his death. Appellant's Brief at 49. Appellant argues that, because the Commonwealth must prove that the defendant intended to inflict pain and suffering beyond that which is

15. Appellant's assertion here is mistaken, as the medical testimony presented at trial clearly established that Raymond's death was caused by blunt-force trauma inflicted over the course of twelve to twenty-four hours, which in turn caused brain damage, hemorrhaging, seizures, and death. See sufficiency discussion, supra. Dr. Lieberman specifically testified that Raymond's death was caused by multiple blunt-force injuries, and that the manner of death was homicide. N.T., 11/14/00, at 23.

necessary to cause death upon the victim to establish the torture aggravator, the fact that the medical examiner could not point to a "final blow" that caused Raymond's death precludes a finding of torture.[16] Appellant concludes that without expert medical testimony establishing a "final blow," the jury could not properly find torture, because the "primary consideration in evaluating torture as an [aggravator] is how the murder was committed." *Id.* at 47.

The Commonwealth responds that the evidence more than supported a finding of torture. That evidence established that, following a lengthy history of abuse in which appellant abused Raymond severely enough to disfigure his face and cause brain damage, appellant then beat Raymond to death over the course of twelve to twenty-four hours, stopping and starting whenever the six-year-old child cried.

Section 9711(d)(8) of the Sentencing Code, 42 Pa. C.S. § 9711(d)(8), provides that it is an aggravating factor if "[t]he offense was committed by means of torture." To establish that a murder was committed by means of torture, the Commonwealth must show that the defendant "intentionally inflicted ... a considerable amount of pain and suffering that was unnecessarily heinous, atrocious, or cruel, manifesting exceptional depravity." *Commonwealth v. Karenbauer*, 552 Pa. 420, 715 A.2d 1086, 1099 (1998), *cert. denied*, 526 U.S. 1021, 119 S.Ct. 1258, 143 L.Ed.2d 354 (1999); *see also Commonwealth v. Cox*, 546 Pa. 515, 686 A.2d 1279, 1289 (1996), *cert. denied*, 522 U.S. 999, 118 S.Ct. 567, 139 L.Ed.2d 407 (1997); *Commonwealth v. Thomas*, 522 Pa. 256, 561 A.2d 699, 709 (1989). "Implicit in subsection 8 is the requirement of an intent to cause pain and suffering in addition to the intent to kill." *Karenbauer*, 715 A.2d at 1099 (internal quotation marks omitted). The intent to torture may be proven from the circumstances surrounding the killing. *Cox*, 686 A.2d at 1289. This Court has listed the factors to be considered in determining whether the torture aggravator applies as including, but

16. Dr. Rorke testified that Raymond's injuries were caused by "some sort of blunt object." Examples cited by Dr. Rorke were a fist, a wall, lumber, or being thrown to the floor. N.T., 11/14/00, at 14.

not limited to: (1) the manner in which the murder was accomplished, including the number and type of wounds inflicted; (2) whether the wounds were inflicted on a vital or non-vital area of the body; (3) whether the victim was conscious when the wounds were received; and (4) the duration of the episode. *Commonwealth v. Ockenhouse,* 562 Pa. 481, 756 A.2d 1130, 1137 (2000). In reviewing a jury's finding of torture, this Court examines the evidence in the light most favorable to the Commonwealth, and draws all reasonable inferences in its favor. *Commonwealth v. Buehl,* 510 Pa. 363, 508 A.2d 1167, 1181 (1986).

This Court previously addressed the applicability of the torture aggravator in the context of a murder of a child by a parent in *Karenbauer, supra.* In *Karenbauer,* we determined that the finding of the torture aggravator was warranted in part because, had Karenbauer "intended to simply kill the victim, he could have used his prohibitive size advantage and the knife in his possession to do so far more expeditiously than he actually did. Instead, he elected to cause eighteen separate wounds ... not deep enough to cause fatal injury, but certainly deep enough to cause pain to the victim, who remained conscious throughout her ordeal." *Karenbauer,* 715 A.2d at 1099 (internal quotation marks omitted). Like the victim in *Karenbauer,* Raymond suffered an array of wounds at the hands of his father/caretaker, all of which were distinct from the traumatic brain injury that caused the seizure that led to his death. These injuries included blows to the mouth that broke a tooth, blows to the eyes, jaw, and cheek, the back of the head, the neck, the forehead, the upper chest, and arms. Raymond suffered three separate brain hemorrhages, a hemorrhage in the thymus gland, and a spinal cord hemorrhage. Appellant's own description of the night of the murder detailed an all-night beating, where appellant repeatedly kicked, punched, hit, and stomped on Raymond because he "wouldn't shut up." By appellant's own admission, Raymond was conscious throughout the hours-long beating. Nor was appellant's abuse of Raymond limited to the night of the murder; rather, appellant isolated and abused Raymond for a period of

at least several months, subjecting him to prolonged beatings severe enough to be audible to appellant's neighbor and prompting his neighbor to call the police to report the abuse. The frequent beatings inflicted severe injuries, both visible and internal, that disfigured the six-year-old's face and irreparably damaged his brain.

Raymond's injuries were painful, sustained over a long period of time, and the vast majority, if not all, were inflicted prior to death. As with his argument regarding the intent to kill, appellant's argument that there is no evidence to support a finding of torture because there was no "final blow" defies established law and common sense. Had appellant simply intended to kill Raymond, he could have easily done so. Instead, he chose to beat Raymond to death over the course of at least several hours, or, viewed more broadly, the course of months. The evidence amply supported the jury's finding that appellant inflicted all of the injuries present on Raymond, and that he intended to cause pain and suffering beyond that necessary to bring about the victim's death in doing so.

Furthermore, given the fact that the jury found two other aggravating circumstances that appellant does not challenge, and rejected the statutory mitigating circumstances appellant pursued, there is an argument to be made that any error respecting submission of the torture aggravator was harmless. "Our Death Penalty Statute provides that if the jury finds at least *one* aggravating circumstance and no mitigating circumstances, then the verdict *must* be death." *Buehl,* 508 A.2d at 1181 (construing 42 Pa.C.S. § 9711(c)(1)(iv)); *see also Commonwealth v. Rivera,* 565 Pa. 289, 773 A.2d 131, 139 (2001), *cert. denied,* 535 U.S. 955, 122 S.Ct. 1360, 152 L.Ed.2d 355 (2002) (sentencing procedure for first-degree murder requires sentence of death if jury unanimously finds at least one aggravating circumstance and no mitigating circumstance). Thus, so long as one aggravator was sustainable, if there were no mitigators, the statute requires that the death sentence must be upheld.[17]

17. Conversely, we have ordered a new sentencing hearing when the jury finds one or more mitigating circumstances in addition to the

What complicates matters here is that, although the jury rejected the statutory mitigating circumstances that appellant pursued, it listed "mercy" as a mitigator and then weighed mercy against the aggravators. Strictly speaking, a finding of "mercy" unmoored from a specific statutory mitigator should not trigger a capital jury's weighing process. The "catchall" mitigator in the capital sentencing scheme only permits a jury to consider "[a]ny other evidence of mitigation **concerning the character and record of the defendant and the circumstances of the offense.**" 42 Pa.C.S. § 9711(e)(8) (emphasis added). We have previously held, for example, that the testimony of a victim's mother regarding her personal opposition to the death penalty was inadmissible as a mitigating factor because the personal beliefs of a victim's family member do not fall within this definition. *Commonwealth v. Bomar*, 573 Pa. 426, 826 A.2d 831, 852 (2003).

Similarly, "mercy," as a stand-alone factor, is not a characteristic of the defendant or a circumstance of the crime, and thus does not fall within the catchall mitigator or any other specific mitigator. Of course, a jury may consider mercy or sympathy when weighing specific aggravating and mitigating factors, but it may not exercise its sense of mercy or sympathy in a vacuum. By the same token, appellant was entitled to present and argue any evidence that was relevant and admissible to statutory mitigators in his attempt to convince the jury to exercise its mercy or sympathy and return a life sentence. But the jury must correspondingly bottom any such exercise of mercy or sympathy on the evidence of specific mitigators. *See Commonwealth v. Rainey*, 540 Pa. 220, 656 A.2d 1326, 1334 (1995) (citing *Commonwealth v. Zook*, 532 Pa. 79, 615 A.2d 1, 13 (1992)). This rule is essential to avoid arbitrariness in sentencing, as "[i]n the absence of a standard to guide the jury's expression of mercy and leniency, there would be no guarantee of consistency in sentencing across

aggravators (and thus engaged in a weighing process), and the evidence was insufficient to sustain one of the aggravating factors. *See, e.g., Commonwealth v. Stallworth*, 566 Pa. 349, 781 A.2d 110, 126 (2001); *Commonwealth v. Bolden*, 562 Pa. 94, 753 A.2d 793, 799 (2000).

cases." *Rainey*, 656 A.2d at 1333 (internal quotation marks omitted).

In this case, since appellant did pursue statutory mitigators, it is not apparent that considerations of mercy necessarily were inappropriate. We leave for another day whether the jury should be instructed so as to preclude its finding and weighing "mercy" if it does not issue a predicate finding of a specific, statutory mitigating circumstance.

## VIII. Trial Court Instruction on Aggravating and Mitigating Circumstances

■■■ Appellant next claims that the trial court erred by issuing a defective penalty phase instruction to the jury. Appellant contends that the instruction was disjointed, confusing, and impossible for a reasonable person to understand. Considering the charge as a whole, appellant argues that the jurors likely concluded that, before they could weigh a mitigating circumstance, they must unanimously agree that the mitigating circumstance existed. Appellant also avers that the charge failed to adequately stress that different burdens of proof attach to aggravating and mitigating circumstances.[18] Finally, appellant finds fault with the length of the jury instructions, stating that "[i]t should not take twenty-seven pages of instructions to explain to a jury how to determine the aggravating and mitigating circumstances[.]" Appellant's Brief at 51.

In response, the Commonwealth argues that this claim is waived due to appellant's failure to object to the charge at the conclusion of the trial court's instructions. *See* Pa.R.A.P. 302(a). A review of the record once again shows that the Commonwealth is correct: appellant did not object to the instruction despite the trial court's invitation to counsel to make any additions or corrections. N.T., 11/28/00, at 66.

18. Appellant's claim sounds in *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), but he fails to cite that case, relying instead upon the non-binding decision in *Frey v. Fulcomer*, 132 F.3d 916 (3d Cir.1997).

The absence of a contemporaneous objection below constitutes a waiver of appellant's current claim respecting the trial court's instructions. Pa.R.A.P. 302(a). Therefore, the claim is defaulted. To the extent appellant would raise the claim as one sounding in counsel ineffectiveness, we will address it in our examination of Claim IX, below.

## IX. Ineffective Assistance of Counsel at the Guilt and Penalty Phase

Appellant next argues that he received ineffective assistance of counsel at the guilt and penalty phases in numerous respects. Appellant's individual claims of trial court error are largely derivative of claims which we have previously deemed waived due to appellant's failure to object below.

At the guilt phase, appellant claims that trial counsel was ineffective for: (1) failing to request a prompt curative instruction after Tyrone Powell testified that appellant "calmed down after he got out of prison[,]" Claim IIB, *supra;* (2) arguing during his closing argument that the real issue in the case was whether appellant was guilty of first- or third-degree murder; (3) failing to object to the prosecutor's closing argument, in which the prosecutor allegedly argued that appellant had committed prior bad acts, including assaulting Desiree Graves, Claim IV, *supra;* and (4) failing to request a jury charge on involuntary manslaughter, Claim V, *supra.*

Respecting the penalty phase, appellant argues that he received ineffective assistance because counsel: (5) failed to properly investigate potential mitigating circumstances, including appellant's drug and alcohol use and the alleged personality changes appellant underwent when using drugs and alcohol; (6) failed to produce or investigate psychiatric evaluations and presentence reports available from appellant's prior court contacts, or hospital records that may have revealed injuries to appellant's brain from a blow to the head and inpatient drug and alcohol treatment records; and (7) failed to investigate or present argument on extreme emotional or mental distress as a mitigating factor.

In response, the Commonwealth points to *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002), in which this Court held that ineffectiveness claims are generally not reviewable on direct appeal, but should be deferred until collateral review. Appellant makes no argument as to why *Grant* should not apply.

In *Grant*, this Court announced the general rule that a defendant "should wait to raise ineffective assistance of trial counsel until collateral review." 813 A.2d at 738. *Grant* applied the rule to "any other cases on direct appeal where the issue of ineffectiveness was properly raised and preserved." *Id.* In *Commonwealth v. Bomar*, 573 Pa. 426, 826 A.2d 831, 853–54 (2003), this Court recognized a limited exception to *Grant*. In *Bomar*, we determined that the appellant's ineffectiveness claims could be reviewed on direct appeal because the extensive record developed on the ineffectiveness claims in the trial court negated any need to rely upon extra-record sources such as averments in appellate briefs or affidavits to resolve the claims. *Id.* at 854. This extensive record developed because trial counsel withdrew following sentencing, appellate counsel had filed post-sentence motions raising the ineffectiveness claims, the trial court conducted hearings on the post-sentence motions where trial counsel testified, and the court addressed the ineffectiveness claims in its opinion. *Id.* at 853.

Here, new counsel entered an appearance at the conclusion of the penalty phase, and the trial court addressed appellant's ineffectiveness claims in its opinion. However, unlike *Bomar*, there was no post-trial hearing with testimony from trial counsel. The Commonwealth therefore argues that this case falls under *Grant*, and concludes that appellant's claims are not reviewable on direct appeal. We agree.

In *Commonwealth v. Pagan*, 597 Pa. 69, 950 A.2d 270 (2008), we examined the application of the *Bomar* exception to a case in which the claim of ineffectiveness was record-based, but where there was no hearing on the ineffectiveness claim below and, thus, no testimony by counsel. We held that without an ineffectiveness hearing, "there is an insufficient factual record to consider the claim." *Pagan*, 597 Pa. at 98,

950 A.2d at 287. Additionally, we noted that it was unlikely that the record-based challenges presented by the appellant in *Pagan* exhausted the "universe of claims" which might be pursued in the longer timeframe available to counsel upon PCRA review. *Id.* at 287–88 (quoting *Commonwealth v. May*, 584 Pa. 640, 887 A.2d 750, 758 (2005)).

In the absence of an ineffectiveness hearing where counsel testifies, the mere fact that the trial court addressed appellant's ineffectiveness claim in its opinion does not implicate the *Bomar* exception to *Grant*. *See May*, 887 A.2d at 757–58. The absence of an ineffectiveness hearing, and the likelihood that other ineffectiveness claims will be discovered and raised on PCRA review, weigh against premature review of appellant's collateral claims on direct review. Finally, appellant fails to cite or acknowledge *Grant*, and thus he forwards no argument as to why we should review his ineffectiveness claims on direct, rather than collateral, review. Accordingly, appellant's claims of ineffective assistance of counsel are dismissed without prejudice to his right to pursue PCRA relief.

## X. Statutory Review

Having reviewed all of appellant's claims, we conclude that relief is not warranted. Accordingly, pursuant to the Sentencing Code, this Court is required to conduct a statutory review of the death sentence and we must affirm the sentence unless we determine that:

(i) the sentence of death was the product of passion, prejudice, or any other arbitrary factor; or

(ii) the evidence fails to support the finding of at least one aggravating circumstance....

42 Pa.C.S. § 9711(h)(3). After careful review, we conclude that the evidence was sufficient to support all three aggravating factors found by the jury. Appellant does not debate, nor could he, that Raymond was under the age of twelve when he was murdered. As to the significant history of felony convictions, the evidence established that appellant had been convicted of aggravated assault and robbery in February, 1979, and been sentenced to six to twenty-three months' incarcera-

tion on the aggravated assault charge, with five years' probation on the robbery charge. Appellant was again convicted of one count each of robbery and aggravated assault in 1982, and was sentenced to four to eight years' incarceration on each charge, to run concurrently. Four prior convictions, arising out of two criminal episodes, is sufficient to sustain the jury's finding that appellant had a substantial history of felony convictions. Finally, as discussed in Claim VII, *supra*, the evidence was more than sufficient to sustain the torture aggravator. Furthermore, after careful review of the record, we are satisfied that the jury's sentence of death was not the product of passion, prejudice, or any other arbitrary factor, but was based upon the evidence admitted at trial.

Accordingly, we affirm the verdict and the sentence of death imposed upon appellant by the Court of Common Pleas of Philadelphia County, and dismiss appellant's claims of ineffectiveness of trial counsel without prejudice to appellant's right to raise those claims on collateral review under the PCRA.[19]

Justice SAYLOR, EAKIN and BAER, Justice TODD, Justice McCAFFERY and Justice GREENSPAN join the opinion.

**19.** The Prothonotary of the Supreme Court is directed to transmit a complete record of this case to the Governor in accordance with 42 Pa.C.S. § 9711(i).