J-S11005-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| GREGORY POWELL | : | |
| | : | |
| Appellant | : | No. 2143 EDA 2021 |

Appeal from the PCRA Order Entered September 20, 2021
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0100741-1998

BEFORE: OLSON, J., McLAUGHLIN, J., and KING, J.

MEMORANDUM BY OLSON, J.: **FILED AUGUST 8, 2023**

Appellant, Gregory Powell, appeals from the September 20, 2021 order entered in the Court of Common Pleas of Philadelphia County that dismissed his petition filed pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546. We affirm.

Our Supreme Court previously summarized the factual history as follows:

> [The victim] was born [in] November [] 1991, the son of [Mother], with whom [Appellant] had an ongoing relationship for a number of years that included periods of cohabitation. Whether or not [the victim] was [Appellant's] biological child was disputed at trial; however, it was undisputed that [Appellant's] name appears on [the victim's] birth certificate as his father, that [the victim] knew [Appellant] as his father, and that [Appellant] held out [the victim] as his biological son. [The victim] lived with [Mother] or his maternal grandmother for the majority of his life, but [Appellant] obtained custody of [the victim] in 1997, while [Mother] was in a residential treatment program for addictions to cocaine and alcohol. After [Appellant] obtained custody, [the victim] was

exclusively under his care and control, seeing [Mother] on only a few occasions before his death.

Appellant and [the victim] resided [in a first-floor apartment located] in Philadelphia, [Pennsylvania.] A neighbor[], who lived in the second floor rear apartment of the building, often saw [the victim] and [Appellant], and had regular access to their apartment to spray insecticides. According to [the neighbor], the apartment was always neat and clean, but he often noticed that [the victim] had dark circles around his eyes and that he "appeared frail." At least twice a week during the nine to twelve months leading up to the murder, [the neighbor] heard [Appellant] cursing and yelling at [the victim] that he [] told him time and time again not to do things and to "shut the fuck up." [The neighbor] heard furniture being knocked over or pushed about, the sound of blows, and [the victim] crying and pleading with [Appellant] to stop. While [the neighbor] never spoke with [Appellant] about what he heard, he did call the police and the Department of Human Services to report the abuse. The police came to investigate, but at the time, they found nothing amiss and they left.

Because [Appellant] worked evenings, [the victim] was cared for in his paternal grandmother's home by his grandmother and uncle from after school until approximately 11:00 p.m. on school days, after which [Appellant] would pick [the victim] up and take him home. Appellant's brother[] lived four blocks from [the paternal grandmother's house] and saw [the victim] frequently. [The brother] noticed that [the victim] was frequently bruised or injured, and later said that both he and his mother were "suspicious" of [the victim's] myriad [of] wounds. Less than a month before [the victim] was murdered, [the brother] noticed that [the victim] had a large knot on his forehead that lasted two to three weeks, as well as a black eye. A week before the murder, [the brother] touched [the victim] on [the] sides [of his body,] and [the victim] moaned and said that his sides were sore. [The brother] later stated that the shape of [the victim's] face [] actually begun to change from the frequent injuries, and [] started to look "like a prizefighter's face that had been in a lot of fights, like someone had been beating on it a lot."

Other than [Appellant's] mother and brother, few people ever saw or spoke with [the victim] outside of [Appellant's] presence. [The victim] saw [Mother] only three times between March and November 1997. While [Mother] asked [Appellant] to allow her to see [the victim] on other occasions, [Appellant] claimed that

- 2 -

[the victim] was sick or that he did not have time to bring him for a visit. Appellant walked [the victim] to school every morning and [the victim's] teacher remembers a polite and friendly child with a nice smile; however, for several weeks before [the victim's] death, he did not attend school. [An] acquaintance of [Appellant], saw [the victim] several times during the month-long period leading to his death, but [Appellant] would not allow her to see [the victim] outside of his presence and would not allow [the victim] to play with [the acquaintance's] children. [The acquaintance] testified that at one time, she went to [the victim's bed]room to talk with him and [Appellant] followed her and did not allow [the victim] to speak for himself. Appellant told [the acquaintance] that [the victim] did not appreciate what [Appellant] was doing for him, that he "always wanted his way," and that once, when [the victim] asked for a glass of water but then drank very little of it, [Appellant] threw the rest of the water into the six-year-old [victim's] face. When [the acquaintance] asked why, [Appellant] explained that after that incident, [the victim] "never did it again." [The acquaintance] also noticed that during the month before his death[, the victim] was always sick, and that the day before he died he had a large lump on his forehead. Appellant told her that [the victim] was clumsy and fell a lot.

Events the night of [the victim's] murder unfolded as follows. At some point in the evening of November 20, 1997, [Appellant] called his mother's house, spoke with his brother, [] and told him that [the victim] hit his head on the wall and would not wake up. Leaving [the victim] at his apartment, [Appellant] then went to his mother's house and told his mother and brother that he could not wake [the victim], and that [the victim] had been playing when he ran into the wall. Appellant called 911 [emergency services] from his mother's house.

At approximately 11:00 p.m., Philadelphia firefighters[,] serving on collateral duty as [emergency medical services ("EMS")] personnel, were summoned to [Appellant's] apartment. They arrived to find the building dark and vacant. They were unable to gain entry, but [Appellant] then appeared and approached them. When [Appellant] informed [the firefighters] that he summoned them to the house because something was wrong with his son, the [firefighters] detected the odor of alcohol on his breath.

Appellant let the firefighters into his apartment, where [the victim] was lying on the sofa covered with a blanket. From the color of

[the victim's] skin, [the firefighters] could immediately tell that [the victim] was dead. When asked what [] happened, [Appellant] said that [the victim fell] in the bathtub and hit his head at approximately 9:00 p.m. that night. [One of the firefighters] saw no head wounds on [the victim] but did observe bruising on his chest and abdomen. When [the firefighter] asked [Appellant] why he waited so long to call 911 [emergency services, Appellant] did not respond. [The victim] was then transported to the [hospital], where he was pronounced dead upon arrival.

The doctor who examined [the victim's] body reported that the bruises observed by [the firefighter] were "suspicious," and [a police officer] was summoned to the hospital. [The police officer] spoke with [Appellant] in the waiting room of the hospital, and [Appellant] told him that [the victim] had been running in the house, fell, and hit his head. Appellant said that [the victim] was in and out of consciousness after the head injury, and that he tried to perform [cardiopulmonary resuscitation ("CPR") on the victim]. Appellant stated that [the victim] was still breathing when he put him down to sleep on the couch, and that after putting [the victim] down, [Appellant] went to sleep himself. When he woke, [Appellant] claimed that [the victim] stopped breathing, so he called 911 [emergency services]. According to [the police officer, Appellant's] manner was nervous and distracted.

Appellant spoke with several other people while at the hospital or shortly afterwards. Appellant called [the acquaintance] and told her that he [] called [the victim] into the kitchen for dinner, and that when [the victim] came in, he hit his head on the wall and fell. Appellant said that [the victim] would not wake up, so he put cold water in the bathtub and put the [victim] in the tub. When he still did not regain consciousness, [Appellant] gave [the victim] mouth-to-mouth resuscitation and then brought him in the living room and placed him on the [couch]. When [the acquaintance] asked why [Appellant] did not contact someone or take him to the hospital, [Appellant] stated that "it had happened before" and he had "brought him back." Appellant also told [the acquaintance] that he had gotten high that day, and that if he had not been high, perhaps he could have reacted better.

Appellant also discussed [the victim's] death with [a second neighbor] the day after [the victim's] death. Appellant brought two beers over to [the second neighbor's] house, gave [the second neighbor] one, and said that he thought he [] killed his son. Appellant told [the second neighbor] that [the victim]

- 4 -

"wouldn't shut up," and that he hit [the victim] "all night" to get him to stop crying. Appellant told [the second neighbor] that "every time [the victim] would cry, he would beat him. Then he would shut up and he would cry again, then [Appellant] would beat him some more. Then he would cry again, then he stomped him." Shortly before leaving, [Appellant] told [the second neighbor], "what's done is done, fuck it." [The second neighbor] called the police.

The same day, police crime[-]scene[-]unit personnel went to [Appellant's] apartment to photograph the scene. Two sections of drywall in the kitchen were caved in. The [police] officers could not determine when the damage [] occurred, but there was no plaster dust, which indicated that the damage was not recent.

Appellant was charged with endangering the welfare of a child and first-degree murder. A jury trial commenced on October 31, 2000. At trial, the Commonwealth presented the testimony of [Mother, the acquaintance, the brother, and the second neighbor], as well as significant medical testimony. The medical examiner, Dr. Erwin Lieberman [("Dr. Lieberman")], testified that [the victim] had "more than ten" fresh injuries, as well as numerous healing injuries and old scars. The new injuries were on the [victim's] head, chest, collarbone, upper back, lower back, elbows, and mouth, including a recently broken tooth. According to [Dr. Lieberman], the head and mouth injuries were caused by blunt force trauma with a relatively padded instrument, such as a hand. Additionally, there was extensive hemorrhaging in [the victim's] thymus gland, which is located high up on the chest, fluid in [the victim's] lungs[,] and traumatic brain injury. [Dr. Lieberman] explained that the fluid in [the victim's] lungs was caused by a seizure, which was brought on by blows to the head. Dr. Lieberman testified that, during the seizure, [the victim] would have exhibited involuntary jerking movements, his eyes would have rolled back in his head, and foam would have come from his nose and mouth due to the water building up in his lungs. Dr. Lieberman testified that the manner of death was multiple blunt force injuries and that the cause of death was homicide. Dr. Lieberman also stated that the injuries [the victim] sustained would have killed not just a small child, but also "an 18-year-old or a 40-year-old."

A neuropathologist, Dr. Lucy B. Rorke [("Dr. Rorke")], examined [the victim's] brain, spine, and eyes, and found both acute injuries (inflicted within twelve to twenty-four hours of death) and older

injuries. The oldest brain injuries were "several months old." Dr. Rorke testified that there were hemorrhages in [the victim's] eyes, as well as under and along the membranes that cover the brain. Some of the hemorrhages had been present for some time, while there was also acute bleeding in the brain, blood clots, and evidence of oxygen deprivation. Dr. Rorke also testified that fluid in [the victim's] brain was stained with blood, and that there was bleeding in his spinal cord that was several weeks old. She noted that [the victim's] brain displayed evidence of acute oxygen deprivation. Dr. Rorke testified that [] the injuries she described were typically secondary to trauma, of a type commonly found in battered and traumatized infants. Although the injuries were not externally apparent, Dr. Rorke added that the older retinal hemorrhaging could have been detected had a doctor looked into [the victim's] eyes. The recent injuries were detectable only during autopsy.

In his defense, [Appellant] presented the testimony of his mother, [] his landlord, [the victim's] kindergarten teacher, a family friend, a school crossing guard, [Appellant's] work supervisor who had met [the victim] on a few occasions, and [the victim's] primary care physician, all of whom testified that they never noticed any signs of abuse and that [the victim] appeared to be a happy and normal child. However, [the victim's] kindergarten teacher also testified that [the victim] had not been in school for over a week before his death.

*Commonwealth v. Powell*, 956 A.2d 406, 414 (Pa. 2008) (record citations, extraneous capitalization, footnote, and original brackets omitted), *cert. denied*, 556 U.S. 1131 (2009). A jury convicted Appellant of first-degree murder and endangering the welfare of a child.[1] *Powell*, 956 A.2d at 414.

The penalty phase began on November 27, 2000. The Commonwealth incorporated the trial evidence, while [Appellant] testified on his own behalf and presented the testimony of his mother and his [other] brother[.] The Commonwealth submitted three aggravating factors to the jury: (1) that the victim was under twelve years of age; (2) that the offense was committed by

---

[1] 18 Pa.C.S.A. §§ 2502(a) and 4304, respectively.

means of torture; and (3) that [Appellant] had a significant history of felony convictions involving the use or threat of violence to the person. Three mitigating circumstances were also presented: (1) that [Appellant] was under the influence of extreme mental or emotional disturbance; (2) the capacity of [Appellant] to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired; and (3) the catchall mitigator. The jury found all three aggravating circumstances, and wrote in as a mitigating circumstance, "mercy." The jury concluded that the aggravating circumstances outweighed the non-statutory mitigating circumstance, and, accordingly, returned a verdict of death for [Appellant's] first-degree murder conviction. Appellant filed a motion in arrest of judgment and for a new trial. At that time, [Appellant's] original [trial] counsel was permitted to withdraw, and new counsel was appointed. The motion in arrest of judgment and for a new trial was denied, and [Appellant] was formally sentenced to death for [first-degree] murder, and to three and one-half to seven years' incarceration for endangering the welfare of a child, to be served concurrently. A second post-sentence motion was filed on May 29, 2001, and denied.

*Id.* (footnotes and record citations omitted). On September 24, 2008, our Supreme Court affirmed Appellant's judgment of sentence,[2] and the Supreme Court of the United States denied a petition for *writ* of *certiorari* on March 23, 2009.

On July 8, 2009, Appellant filed *pro se* a timely PCRA petition. The next day, counsel from the Federal Community Defender Office ("FCDO counsel") filed an unopposed emergency motion for stay of execution on the ground that Appellant had not been afforded collateral review of his convictions and

_____

[2] Pursuant to 42 Pa.C.S.A. § 9711(h)(1), our Supreme Court had automatic appellate review of Appellant's case because a sentence of death was imposed. 42 Pa.C.S.A. § 9711(h)(1).

sentence.[3]   Unopposed Emergency Motion for Stay of Execution, 7/9/09. Although an order granting Appellant's request for a stay of execution does not appear as part of the PCRA court docket, based upon the filing of Appellant's *pro se* PCRA petition and the PCRA court's subsequent grant of a continuance on November 17, 2009, to afford FCDO counsel an opportunity to review the record, it is apparent that a stay of execution was, in fact, granted.

On April 22, 2010, Appellant filed *pro se* a motion to dispense with court-appointed counsel and proceed *pro se* in his PCRA petition.   On September 2, 2010, Appellant filed *pro se* a motion requesting a **Grazier** hearing to address his request for self-representation.[4]   On October 29, 2010, FCDO counsel filed a motion for *ex parte* and under seal proceedings, regarding objections to Appellant's request for self-representation and an evidentiary proffer that Appellant suffered from significant mental impairments which prevented him from adequately representing himself. Motion for *Ex Parte* and Under Seal Proceedings, 10/29/10.   In the motion, FCDO counsel asserted, "the Commonwealth lacks standing to participate in the resolution of [counsel's objections.]" **Id.** at ¶2.

On September 8, 2011, the PCRA court denied Appellant's *pro se* motion requesting self-representation, and granted FCDO counsel's request for a

_____

[3] Appellant's execution was scheduled for August 18, 2009.  FCDO counsel entered his appearance on behalf of Appellant on October 13, 2009.

[4] **Commonwealth v. Grazier**, 713 A.2d 81 (Pa. 1998).

psychiatric examination of Appellant. On October 11, 2011, the Commonwealth appealed the September 8, 2011 PCRA court order denying Appellant's *pro se* motion requesting self-representation on the ground that FCDO counsel does "not properly represent [Appellant] and [FCDO counsel's] appearance in state court is unlawful." Commonwealth's Statement of Errors Complained of on Appeal, 10/11/11. In a May 10, 2012 *per curiam* order, our Supreme Court remanded the case to the PCRA court with the directive that the PCRA court "determine whether to formally appoint appropriate post-conviction counsel and to consider whether [FCDO counsel] may or should lawfully represent [Appellant] in this state capital PCRA proceeding." *Per Curiam* Order, 5/10/12 (641 CAP 2012). Upon remand, the PCRA court removed FCDO counsel from Appellant's case and scheduled a ***Grazier*** hearing to determine whether Appellant wished to proceed *pro se*. PCRA Court Order, 6/14/12; ***see also*** N.T., 6/14/12.

On August 22, 2014, the PCRA court appointed Samuel Stretton, Esquire ("Attorney Stretton") to represent Appellant. On November 7, 2014, Appellant filed *pro se* a motion to remove Attorney Stretton and to proceed *pro se*. On August 26, 2015, the PCRA court, without first conducting a ***Grazier*** hearing, denied Appellant's motion to proceed *pro se* and confirmed Attorney Stretton as counsel of record for Appellant. PCRA Court Order, 8/26/15; ***see also*** N.T., 8/26/15.

On October 3, 2016, Appellant filed *pro se* a motion for the removal of Attorney Stretton as counsel of record "because of [a] serious conflict of

interest." *Pro Se* Motion Regarding Conflict of Interest, 10/3/16, at 4 (unpaginated). On October 19, 2016, the PCRA court granted Appellant's *pro se* motion and appointed Teri Himebaugh, Esquire ("Attorney Himebaugh") to represent Appellant. PCRA Court Order, 10/19/16; ***see also*** N.T., 10/19/16.

On December 15, 2016, the PCRA court *sua sponte* vacated its October 19, 2016 order and reinstated Attorney Stretton as counsel for Appellant on the ground that the October 19, 2016 order was erroneously entered. PCRA Court Order, 12/15/16; ***see also*** N.T., 12/15/16. The PCRA Court also ordered that Appellant's *pro se* motion regarding a conflict of interest be held under advisement. On January 18, 2017, Appellant filed *pro se* a notice of appeal challenging the December 15, 2016 order that reinstated Attorney Stretton's representation of Appellant.[5]

_____

[5] Although Appellant, in his *pro se* notice of appeal, stated he was appealing from a December 8, 2016 order reinstating Attorney Stretton as Appellant's counsel, a review of Appellant's accompanying statement and the PCRA court docket demonstrates that Appellant was appealing the December 15, 2016 order reinstating Attorney Stretton as counsel of record.

Although we can find no indication that the PCRA court forwarded a copy of Appellant's notice of appeal to our Supreme Court, we discern no error (and thus, maintain jurisdiction in the instant appeal) because an order reinstating Attorney Stretton as counsel of record was not a final, and immediately appealable, order. ***See Commonwealth v. Wells***, 719 A.2d 729, 730 (Pa. 1998) (finding that, an order denying a petition to withdraw as counsel does not qualify as a collateral order, and therefore immediately appealable, because such an order does not pertain to a matter unreviewable on appeal from final judgment); ***see also*** Pa.R.A.P. 313(b) (defining a collateral order, which is immediately appealable, as "an order separable from and collateral to the main cause of action where the right involved is too important to be

- 10 -

On December 31, 2018, Attorney Stretton filed an amended PCRA petition, asserting several claims of ineffective assistance of trial counsel and requesting a new trial, or in the alternative, that the PCRA court vacate the death penalty sentence. Amended PCRA Petition, 12/31/18. On May 17, 2019, in a *pro se* letter directed to the PCRA court, Appellant reiterated his "conflict of interest" claim against Attorney Stretton and renewed his request to have Attorney Stretton removed as counsel. *Pro Se* Letter, 5/17/19. On May 20, 2019, Appellant filed *pro se* a motion for the appointment of new counsel due to an irreconcilable conflict of interest with Attorney Stretton.

On June 17, 2019, the Commonwealth filed a response to Appellant's amended PCRA petition. In its response, the Commonwealth, *inter alia*, agreed that Appellant "received ineffective assistance of counsel" during the penalty phase hearing, and requested that the PCRA court grant a new penalty phase hearing. Commonwealth Response, 6/17/19, at 2. The Commonwealth further stated that if a new penalty phase hearing were granted, the Commonwealth remained "committed to maintaining a life sentence without the possibility of parole[.]" ***Id.*** at 3. That same day, the PCRA court vacated Appellant's death sentence upon agreement of both the Commonwealth and

---

denied review and the question presented is such that if review is postponed until final judgment in the case, the claim will be irreparably lost").

- 11 -

Appellant's counsel.[6]   PCRA Court Order to Vacate Death Penalty by Agreement, 6/17/19; *see also* N.T., 6/17/19.

On June 17, 2019, the PCRA court also granted Appellant's *pro se* motion for new counsel thereby removing Attorney Stretton as Appellant's counsel. PCRA Court Docket Entry, 6/17/19; *see also* N.T., 6/17/19, at 8-9.   On September 17, 2019, the PCRA court appointed George Yacoubian, Esquire ("Attorney Yacoubian") to represent Appellant in his PCRA proceedings.   On October 23, 2019, Attorney Yacoubian filed a motion to withdraw as counsel.[7] On November 6, 2019, Appellant filed *pro se* a motion requesting self-representation in his PCRA proceeding.   On December 17, 2019, the PCRA court granted Attorney Yacoubian's motion to withdraw as counsel for

_____

[6] In its order, the PCRA stated, "after consideration of the motion to vacate death penalty by the attorney for [Appellant,] it is ordered that the motion to vacate death penalty is granted.  Death penalty vacated by agreement of [the] Commonwealth and [Appellant]."  PCRA Court Order to Vacate Death Penalty by Agreement, 6/17/19 (extraneous capitalization omitted).

[7] In his motion to withdraw as Appellant's counsel, Attorney Yacoubian explained,

> On [October 22, 2019], the undersigned [(Attorney Yacoubian)] went to [the state correctional institution] to visit [Appellant] for a second time since appointment.   Within no more than 10 minutes, and only after being asked several questions about his trial transcripts, [Appellant] was screaming at the undersigned. When the undersigned asked [Appellant] to calm down, he continued his verbal abuse, at which point the undersigned left, and [Appellant] indicated he wanted to "go *pro se*."

Motion to Withdraw as Counsel, 10/23/21.

Appellant and scheduled a **_Grazier_** hearing on Appellant's request for self-representation. PCRA Court Order, 12/17/19; **_see also_** N.T., 12/17/19.

On February 10, 2020, the PCRA court, after conducting a **_Grazier_** hearing, denied Appellant's _pro se_ motion for self-representation and appointed James Lloyd, Esquire ("Attorney Lloyd") to represent Appellant in the PCRA proceedings. PCRA Court Order, 2/10/20; **_see also_** N.T., 2/10/20. On March 16, 2020, the PCRA court _sua sponte_ appointed Earl Kauffman, Esquire ("Attorney Kauffman") to represent Appellant. On October 26, 2020, the PCRA court, at the conclusion of a status conference hearing, granted Attorney Kauffman's unopposed request for additional time in which to file a second amended PCRA petition. N.T., 10/26/20. On December 23, 2020, Appellant filed _pro se_ a motion for the appointment of new counsel due to irreconcilable differences with Attorney Kauffman.

On January 31, 2021, Attorney Kauffman filed a second amended PCRA petition. The Commonwealth filed a motion to dismiss Appellant's PCRA petition on March 14, 2021. On July 14, 2021, the PCRA court notified Appellant, pursuant to Pennsylvania Rule of Criminal Procedure 907, of its intent to dismiss his petition without a hearing and advised Appellant he had 20 days to file a response. Rule 907 Notice, 7/14/21. On August 9, 2021, Appellant filed _pro se_ a response to the Rule 907 notice to dismiss. On September 20, 2021, the PCRA court dismissed Appellant's petition. In that same order, the PCRA court granted Attorney Kauffmann's motion to withdraw as counsel and advised Appellant that he "may hire new counsel for appeal

- 13 -

purposes." PCRA Court Order, 9/20/21 (extraneous capitalization omitted). On October 12, 2021, Appellant filed *pro se* a notice of appeal.

In a December 6, 2021 *per curiam* order, this Court directed the PCRA court to determine Appellant's eligibility for court-appointed appellate counsel within 60 days and, if Appellant were eligible, to appoint counsel. In a March 24, 2022 *per curiam* order, this Court, having received no notice of the PCRA court's assessment and whether appellate counsel had been appointed, directed the PCRA court again to make an assessment of Appellant's *in pauperis* status, and appoint counsel, if eligible, within 30 days. On April 26, 2022, the PCRA court re-appointed Attorney Lloyd.

On June 1, 2022, the PCRA court ordered Appellant to file a concise statement of errors complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(b). On June 21, 2022, Appellant filed his Rule 1925(b) statement. The PCRA court filed its Rule 1925(a) opinion on June 30, 2022.

Appellant raises the following issues for our review:

[1.] Did the PCRA court err []or abuse its discretion when it denied [Appellant's] petition under the PCRA without an evidentiary hearing where trial counsel was ineffective for failing to:

    a.    object to evidence regarding nine instances of prior bad acts by [Appellant] which were inadmissible and unduly prejudicial;

    b.    object to the prosecutor's improper closing argument;

> c.       object to the [trial] court's answer to a jury question
> which provided an inaccurate, incomplete[,] and
> misleading statement of controlling law;
>
> d.       have the [trial] court give a timely and non-prejudicial
> curative jury instruction regarding improper
> testimony that [Appellant] "calmed down after he
> went to prison" []or not objecting to a prejudicial
> curative instruction; and,
>
> e.       challenge the cause of death[?]
>
> [2.] Did the PCRA court err []or abuse its discretion when it
> denied [Appellant's] petition under the PCRA without an
> evidentiary hearing where PCRA counsel was ineffective for
> failing to raise claims that trial counsel was ineffective for
> failing to properly investigate and prepare for trial by not
> presenting medical evidence that conflicted with the
> Commonwealth's evidence and theory of guilt?

Appellant's Brief at 4-5.

In addressing Appellant's issues, we are mindful of our well-settled standard and scope of review of an order denying a PCRA petition. Proper appellate review of a PCRA court's dismissal of a petition is limited to an examination of "whether the PCRA court's determination is supported by the record and free of legal error." ***Commonwealth v. Miller***, 102 A.3d 988, 992 (Pa. Super. 2014) (citation omitted). "The PCRA court's findings will not be disturbed unless there is no support for the findings in the certified record." ***Commonwealth v. Lawson***, 90 A.3d 1, 4 (Pa. Super. 2014) (citations omitted). "This Court grants great deference to the findings of the PCRA court, and we will not disturb those findings merely because the record could support a contrary holding." ***Commonwealth v. Hickman***, 799 A.2d 136, 140 (Pa. Super. 2002) (citation omitted). In contrast, we review the PCRA court's

legal conclusions *de novo*. **Commonwealth v. Henkel**, 90 A.3d 16, 20 (Pa. Super. 2014) (*en banc*), *appeal denied*, 101 A.3d 785 (Pa. 2014).

Appellant's first issue, *in toto*, raises a claim alleging that trial counsel provided ineffective assistance. Appellant's Brief at 22-53. Specifically, Appellant alleges that trial counsel was ineffective for failing to (1) object to prior bad acts evidence, which Appellant asserts was inadmissible and unduly prejudicial; (2) object to statements made by the Commonwealth in its closing argument; (3) object to the trial court's answer provided in response to a question raised by the jury during its deliberation; (4) object when the trial court failed to provide a curative jury instruction during its charge that the trial court previously ruled it would provide; and (5) challenge the victim's cause of death. **Id.**

"It is well-established that counsel is presumed effective[.]" **Commonwealth v. Koehler**, 36 A.3d 121, 132 (Pa. 2012), *citing* **Strickland v. Washington**, 466 U.S. 668, 687-691 (1984). To plead and prove a claim of ineffective assistance of counsel, "a petitioner must establish: (1) that the underlying issue has arguable merit; (2) counsel's actions lacked an objective[ly] reasonable basis; and (3) actual prejudice resulted from counsel's act or failure to act." **Commonwealth v. Stewart**, 84 A.3d 701, 706 (Pa. Super. 2013) (*en banc*), *appeal denied*, 93 A.3d 463 (Pa. 2014). "A claim of ineffectiveness will be denied if the petitioner's evidence fails to meet any of these prongs." **Commonwealth v. Martin**, 5 A.3d 177, 183 (Pa. 2010). "In determining whether counsel's action was reasonable, we do not

question whether there were other more logical courses of action which counsel could have pursued[. R]ather, we must examine whether counsel's decision[] had any reasonable basis." *Commonwealth v. Washington*, 927 A.2d 586, 594 (Pa. 2007). A petitioner establishes prejudice when he or she demonstrates "that there is a reasonable probability that, but for counsel's [acts or omissions], the result of the proceeding would have been different." *Commonwealth v. Johnson*, 966 A.2d 523, 533 (Pa. 2009).

Here, Appellant asserts that trial counsel was ineffective for failing "to object to evidence regarding nine instances of prior bad acts by [Appellant] which were inadmissible and unduly prejudicial." Appellant's Brief at 25. Specifically, Appellant argues that trial counsel failed to object to (1) Mother's "testimony that [Appellant] cursed at her, followed her around, and was abusive[;]" (2) Mother's "testimony that [Appellant] tried to steal her money and burned her with an iron[;]" (3) Mother's "testimony that [Appellant] knocked her into a closet door[;]" (4) the neighbor's "testimony that [Appellant] was a loud and abusive person[;[8]]" (5) the acquaintance's "statement that [Appellant] never hugged or talked to the [victim;]" (6) statements made by [Appellant's] brother[] that [Appellant] threw a sandwich

_____

[8] In response to the Commonwealth's question whether the neighbor heard "anything unusual coming from [Appellant's] apartment at any time during the month of November [1997,]" the neighbor stated, "It wasn't quite unusual at all to hear [Appellant]. He was a loud and abusive person. He cursed a lot[,] and I could hear him hollering at the [victim] a lot." N.T., 11/13/00, at 107.

at [the brother] when they were younger[;]" (7) the brother's "testimony that [Appellant] had gotten so mad he could kill someone[;]" (8) "the Commonwealth's question regarding [Appellant's] reaction to his name not being in [the victim's] obituary[;]" and (9) the second neighbor's "statement that [Appellant] hollered at his girlfriend." *Id.* at 25-26. Appellant contends that the nine instances of prior bad acts evidence demonstrating that he was loud, angry, and abusive toward people other than the victim were used to "smear [his] character and impermissibly tilt the scale[s] of justice toward a finding of guilty," and trial counsel was ineffective in failing to contemporaneously object to each of the nine statements. *Id.* at 27, 29.

Pennsylvania Rule of Evidence 404 provides, in pertinent part, as follows:

**Rule 404. Character Evidence; Other Crimes, Wrongs, or Acts**

. . .

**(b) Other Crimes, Wrongs, or Acts.**

(1) *Prohibited Uses.* Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

(2) *Permitted Uses.* This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

Pa.R.E. 404(b)(1) and (2). Thus, as our Supreme Court in **Powell**, **supra**, noted, "[w]hile it is true that evidence of prior crimes and bad acts is generally

inadmissible if offered for the sole purpose of demonstrating the defendant's bad character or criminal propensity, the same evidence may be admissible where relevant for another purpose." ***Powell***, 956 A.2d at 419; ***see also Commonwealth v. Busanet***, 54 A.3d 35, 60 (Pa. 2012). In addition to the "other purposes" enumerated in Rule 404(b)(2) that allow for the possible admission of prior bad acts evidence, our Supreme Court carved out another special circumstance, known as the *res gestae* exception, where prior bad acts evidence is admissible if the evidence is "part of the history of [the] case and formed part of [the] natural development of facts[.]" ***Commonwealth v. Solano***, 129 A.3d 1156, 1178 (Pa. 2015); ***see also Commonwealth v. Kinard***, 95 A.3d 279, 284 (Pa. Super. 2014) (*en banc*); ***Powell***, 956 A.2d at 419. Additionally, the prior bad acts evidence must be relevant, and its probative value must be outweighed by the potential for "unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Pa.R.E. 403. Finally, "the admissibility of evidence is within the discretion of the trial court, and such rulings will not form the basis for appellate relief absent an abuse of discretion." ***Commonwealth v. Saez***, 225 A.3d 169, 177 (Pa. Super. 2019) (citation and original quotation marks omitted), *appeal denied*, 234 A.3d 407 (Pa. 2020).

In the case *sub judice*, our review of the PCRA court's denial of Appellant's ineffectiveness claim on this ground turns on the merits of the underlying claim that the trial court erred or abused its discretion in admitting the nine statements, as set forth *supra*. Stated another way, absent an abuse

of discretion or error of law by the trial court in admitting these nine statements at trial, trial counsel cannot be ineffective for failing to object to the statements.

We begin by examining our Supreme Court's disposition of a related claim on direct appeal. There, in addition to the nine statements set forth *supra*, Appellant claimed that he was prejudiced at trial by the admission of three additional statements. Those three statements were (1) Mother's "testimony that [Appellant] put his hands on her[;]" (2) the acquaintance's "statements that [Appellant] had a cold personality[;]" and (3) the acquaintance's statement that Appellant "once threw water in [the victim's face]." **Powell**, 956 A.2d at 418. Our Supreme Court, in **Powell**, **supra**, noted that these three statements, to which trial counsel lodged a contemporaneous objection, were properly admitted because the statements helped establish the family environment and the relationships Appellant had with others, helped "establish the chain of events and pattern of abuse that eventually caused" the victim's death, and showed "both [Appellant's] intent and malice and the nature of the relationship with [the victim]." **Id.** at 419-420. The **Powell** Court found that trial counsel did not object to the remaining nine statements, which are the subject of the instant appeal, and, therefore, any direct appeal claim regarding the admissibility of these nine statements was waived. **Id.** at 419.

In the case *sub judice*, we concur with the PCRA court that the nine statements, which were not addressed on the merits by our Supreme Court in

*Powell*, *supra*, were properly admitted because they were "part of a chain or sequence of events that were part of the natural development of the case" and "illustrate[d] the pattern of abuse that eventually caused the child victim's [death]." PCRA Court Opinion, 6/30/22, at 9-10 (quotation marks and citations omitted). Similar to Mother's statement that Appellant "put his hands on her," which our Supreme Court found was properly admitted, the first three statements involved in this collateral appeal, namely Mother's testimony that Appellant cursed at her, tried to steal from her and burned her with an iron, and that he knocked her into a closet door, were not offered "to show [Appellant's] propensity to crime, but in the context of establishing the family environment and relationships among [Appellant]" (*see Powell*, 956 A.2d at 419) and were provided in response to trial counsel's questions surrounding the protection from abuse petitions that Mother and Appellant filed against each other. In finding that the trial court did not err in admitting Mother's statement that Appellant "put his hands on her," our Supreme Court explained,

> Considering the isolation in which [Appellant] kept [the victim], this testimony was useful for the jury in understanding how [Appellant] kept away [Mother], the other adult most likely to have noticed the abuse and protected [the victim]. Appellant's prior abuse of [Mother] (in addition to her testimony regarding her drug abuse and time in [rehabilitation]) provides context for her later testimony that she took little action when [Appellant] refused to allow her access to her son, or, on those rare occasions when she did see [the victim], to speak with him alone.

*Powell*, 956 A.2d at 420. For the same reasons expressed by our Supreme Court in *Powell*, *supra*, we find the three additional statements by Mother were admitted without error.

Similarly, the neighbor's statement that Appellant was "a loud and abusive person" was made in response to a question by the Commonwealth soliciting whether the neighbor heard "anything unusual" coming from Appellant's apartment prior to November 1997. N.T., 11/13/00, at 107. This response provides context for the neighbor's later statements that he was able to hear Appellant's abusive behavior towards the victim through the walls of the apartments, including, *inter alia*, telling the victim to "shut the fuck up," smacking the victim, and knocking furniture over. *Id.* The neighbor's statement was part of the immediate story or natural progression of events leading to the victim's death and, therefore, was not admitted in error.

With regard to the acquaintance's statement that she never saw Appellant touch the victim or hug him, this statement arose in the context of a discussion surrounding the acquaintance's statements to police regarding the incident. N.T., 11/13/00, at 164-167. On cross-examination, the acquaintance was asked about a statement she made to the police that she "thought [Appellant and the victim] had a good relationship." *Id.* at 164-165. On re-direct, the acquaintance was asked if she still thought Appellant and the victim had a good relationship, to which the acquaintance responded negatively. *Id.* at 167. When asked to explain why her opinion of the relationship changed, the acquaintance responded, "I've never seen

[Appellant] touch [the victim]; I've never seen him hug him or just talk to him, you know, like you would your child. I've never seen that. I thought that was odd." *Id.* at 167. When examined within the context of the acquaintance's overall testimony, her statement completes the story of the relationship Appellant had with the victim. Moreover, the testimony was offered to clarify a statement the acquaintance previously made to police regarding Appellant's relationship with the victim – Appellant and the victim had a good relationship - that was first raised by trial counsel. As such, the challenged statement was not admitted in error.

Regarding Appellant's brother's statements that he witnessed Appellant throw a sandwich and that Appellant got so mad that he could kill, we do not find that these statements were admitted in error. First, Appellant mischaracterizes the brother's statement that he witnessed Appellant throw a sandwich as occurring when they were younger. Appellant's Brief at 25 (stating, "statements made by [the brother] that [Appellant] threw a sandwich at [the brother] **when they were younger**" (emphasis added)). The testimony concerning the sandwich episode was as follows:

| [Commonwealth:] | Do you recall the question on page two at the bottom [(referring to a statement the brother gave to police)] . . . Does [Appellant] have a temper? And giving the answer: Yes, a real bad temper. He's had it since he was born. |
| --- | --- |
| [Brother:] | Yes. |
| [Commonwealth:] | Was that true? |

| [Brother:] | Well, it is the same as I say he had it as we was young, coming up. |
| [Commonwealth:] | In fact, didn't [Appellant] even demonstrate it [(that he had a temper)] the day that you gave this statement [to police] in the car on your way to homicide? |
| [Brother:] | Yeah, he got mad at my oldest brother. [He] and my oldest brother had a little argument and he jumped out of the car. |
| [Commonwealth:] | And threw a sandwich? |
| [Brother:] | Yes. |
| [Commonwealth:] | So he hadn't lost his temper. Is that correct? |
| . . . | |
| [Brother:] | He didn't lose it but it calmed down a lot from when we was young, coming up. |

N.T., 11/14/00, at 90-91. The brother's statement regarding the sandwich concerned events that transpired after the discovery of the victim's death and not during Appellant's childhood. The brother's statement was made in response to the Commonwealth's question regarding a statement the brother previously made to police – that Appellant had a bad temper, and the brother offered the sandwich episode as an example of what he meant when he described Appellant as having a bad temper. This statement was offered to rebut Appellant's claims that the victim's death was the result of an accident or the victim's clumsiness, two explanations Appellant provided to police and witnesses when he characterized the events leading to the victim's death. This statement goes to establishing that the victim's injuries, which ultimately led

to his death, were not the result of an accident or the victim's own clumsiness. **See** Pa.R.E. 404(b)(2) (stating, evidence of other acts "may be admissible for another purpose, such as proving . . . lack of accident"). Therefore, the brother's testimony that Appellant threw a sandwich, as an example of Appellant's bad temper, was not admitted in error.[9]

Regarding the brother's second statement – Appellant got so mad he could kill, the Commonwealth asked the brother, "Did you tell the [police] detective: [Appellant's] temper is so bad that I've seen him get so bad that he could kill with his temper?" The brother responded, "Yes, when [he and I] used to fight a lot." **Id.** at 91. As discussed *supra*, the brother's response rebuts Appellant's claim that the victim's death was the result of an accident or clumsiness. Therefore, this statement was not admitted in error.

Appellant next complains that trial counsel should have objected to the Commonwealth's question regarding Appellant's reactions to his name being omitted from the victim's obituary. Appellant's Brief at 26. A review of the pertinent testimony cited by Appellant is as follows:

> [Commonwealth:]     Did you[, Brother,] know that [Appellant]
>                                wasn't [the victim's] father?

---

[9] Moreover, Appellant's defense throughout trial, as discussed in greater detail *infra*, was that the killing was done with malice but not a specific intent to kill. As such, Appellant placed his character, temper, and aptitude for violence at issue and the Commonwealth was permitted to use evidence of other acts to show Appellant's capacity for, or lack of mistake or accident in, the formation and consciousness of an intent to kill.

. . .

| | |
|---|---|
| [Brother:] | He was proved by the court that he was the father. |

. . .

| | |
|---|---|
| [Commonwealth:] | [Appellant's] name isn't mentioned in [the victim's] obituary, right? |
| [Trial Counsel:] | Objection. |
| [Trial Court:] | Sustained. |
| [Brother:] | Can I – |
| [Commonwealth:] | Nothing further. |

. . .

| | |
|---|---|
| [Trial Counsel:] | Would you like to explain something at this time, sir? |
| [Brother:] | The reason why his name wasn't in the obituary is because [Mother] was all mad and everything. The whole family was mad at us. |
| [Trial Counsel:] | So [Appellant] had nothing to do with the obituary? |
| [Brother:] | No. |
| [Trial Counsel:] | That's the reason the name wasn't there? |
| [Brother:] | Yeah. |

N.T., 11/14/00, at 102-103. A review of the pertinent testimony demonstrates that the Commonwealth's question was not "a question regarding [Appellant's] reaction" to the omission of his name from the obituary, as asserted by Appellant. *See id.* at 103; *see also* Appellant's Brief at 26. Rather, the Commonwealth attempted to demonstrate, through circumstantial evidence, that Appellant's name was omitted from the obituary

because he was not the victim's biological father.  Trial counsel objected to the question, and the trial court sustained the objection.  Trial counsel then asked the brother on recross-examination to explain why Appellant's name was omitted from the obituary.  N.T., 11/14/00, at 103.  The brother explained that Appellant's name was omitted because he did not participate in preparing the obituary, and the obituary was prepared by Mother who was understandably angry with Appellant after he killed her son.  *Id.*  There is nothing in the brother's testimony that constitutes a prior bad act.  Therefore, Appellant's claim that trial counsel was ineffective for failing to object to the brother's testimony on the ground that it constituted prior bad act evidence is without merit.

Finally, Appellant contends that trial counsel was ineffective for failing to object to the second neighbor's statement that he observed Appellant "hollering" at his girlfriend.  Appellant's Brief at 26.  This statement was made in the context of the second neighbor's testimony regarding his interaction with Appellant on the day following the victim's death when Appellant confessed to the second neighbor that he thought he killed the victim.  N.T., 11/15/00, at 17-21.  The pertinent testimony was as follows:

[Commonwealth:]     Did you ever see whether or not [Appellant] had an unusual temper?

[Second Neighbor:]     Yes.

[Commonwealth:]     What have you observed about him?

[Second Neighbor:]     Hollering and screaming, cursing.

[Commonwealth:]     At whom?

- 27 -

[Second Neighbor:] His girlfriend and at the [victim].

*Id.* at 20-21. The second neighbor's statement establishes the family environment and the relationships among Appellant, the acquaintance, and the victim that form the history of the case and were part of its natural development of events which ultimately led to the death of the victim. Moreover, this statement tends to refute Appellant's claims that the victim's death was the result of an accident or the victim's clumsiness. Therefore, these statements were properly admitted, and Appellant's ineffectiveness claim based on this statement is without merit.

Next, Appellant asserts that trial counsel was ineffective for failing to object to a portion of the Commonwealth's closing argument. Appellant's Brief at 35-39. Specifically, Appellant contends that "the Commonwealth twice referenced [Appellant's] alleged abuse of [Mother.]" *Id.* at 35. Appellant argues that "[t]he closing argument, in addition to painting [Appellant] as generally violent and abusive, highlighted evidence of domestic violence likely to evoke a passionate response from the jurors." *Id.* at 26.

Appellant's ineffectiveness claim involves an underlying claim of prosecutorial misconduct for which our standard and scope of review are well-established.

> In reviewing an assertion of prosecutorial misconduct, our inquiry centers on whether the defendant was deprived of a fair trial, not deprived of a perfect trial. It is well-settled that a prosecutor must be free to present his or her arguments with logical force and vigor. Comments grounded upon the evidence or reasonable inferences therefrom are not objectionable, nor are comments that constitute "oratorical flair." Furthermore, the prosecution

must be permitted to respond to defense counsel's arguments. Consequently, [appellate courts have] permitted vigorous prosecutorial advocacy provided that there is a reasonable basis in the record for the prosecutor's comments. A prosecutor's remarks do not constitute reversible error unless their unavoidable effect would prejudice the jurors, forming in their minds fixed bias and hostility toward the defendant so that they could not weigh the evidence objectively and render a true verdict. Finally, [appellate courts] review the allegedly improper remarks in the context of the closing argument as a whole.

*Commonwealth v. Sneed*, 45 A.3d 1096, 1109-1110 (Pa. 2012) (citations, some quotation marks, and original brackets omitted).

A review of the context of the closing arguments presented by both the Commonwealth and trial counsel demonstrates a common agreement that the case was not about whether Appellant's actions resulted in the death of his son but, rather, whether Appellant had the requisite intent to kill his son required for a first-degree murder conviction. *See* N.T., 11/16/00, at 42 (stating, "[t]he case is about the degree of guilt, whether or not there's intent"); *see also id.* at 44 (stating, "I [(the prosecutor)] agree with [trial counsel] on [the issue.] The whole issue for you ladies and gentlemen is: Is [Appellant] guilty of first[-]degree [murder] or guilty of murder in the third[-]degree? Because[] neither one of us [(the Commonwealth nor trial counsel)] thinks that there's any possibility that [Appellant] should not be found guilty."); *Id.* at 58 (explaining that, "I [(Appellant)] accept my responsibility and I told [trial counsel that] I wanted him to some way address the jury and let them know . . . I fully accept my responsibility"). During its closing argument, the Commonwealth argued, in pertinent part, as follows:

| [Commonwealth:] | [Mother] told you [Appellant] is a nice guy except when he's drinking, smoking marijuana, using crack [cocaine]. What did he do to her? He was abusive to her. He was abusive to the child when the child didn't do – |
|---|---|
| [Trial Counsel:] | Objection, your Honor – withdraw. |
| [Trial Court:] | Okay. |
| [Commonwealth:] | - when the child didn't do exactly what he wanted and the child touched the [video cassette recorder,] touched the television – and, remember, [the child] was only four years old at that time, maybe five – he would smack him. This was a baby. And he would still smack him. |

*Id.* at 44-45.[10] As explained *supra*, and as our Supreme Court held in ***Powell***,

***supra***, Mother's testimony regarding the abusive nature of Appellant's actions

towards her – that he put his hands on her when he was drunk or high; that

_____

[10] Although Appellant asserts, in his appellate brief, that "the Commonwealth twice referenced [Appellant's] alleged abuse of [Mother,]" Appellant only cites to one portion of the transcript, which is set forth *supra*. ***See*** Appellant's Brief at 35, *citing* N.T., 11/16/00, at 44 (line 25) and 45 (lines 2-5). A review of the Commonwealth's closing argument demonstrates one additional reference to Appellant's abuse of Mother, as follows:

This poor little boy did not have a chance. I submit to you that between having [Mother] who was using alcohol and drugs but who was trying to get help by going into a [rehabilitation facility,] and [Father], who was using the same stuff but wasn't in a [rehabilitation facility] and who was abusing both of them, that child didn't have a chance.

N.T., 11/16/00, at 53. For purpose of our disposition, we consider this second portion of the Commonwealth's closing argument in conjunction with the portion cited by Appellant.

he cursed at her, followed her, and was abusive; that he tried to steal money from her and burned her with an iron; and that he knocked her into a closet door – were properly admitted testimonial statements. As such, the Commonwealth's references in its closing argument to Appellant's abusive behavior towards Mother were grounded in the evidence and are not objectionable. Therefore, we concur with the PCRA court, and the record supports, that the Commonwealth's references to Appellant's abuse of Mother "would in no way amount to prosecutorial misconduct." PCRA Court Opinion, 6/30/22, at 11; **see also Sneed**, 45 A.3d at 1110 (stating, "[c]omments grounded upon the evidence or reasonable inferences therefrom are not objectionable").

Next, Appellant claims that trial counsel was ineffective for failing to object to the trial court's response, during deliberations, to a jury question regarding *mens rea*. Appellant's Brief at 39-44. Appellant contends that the trial court answered "yes" to the jury's question, "[I]n committing a crime[,] does total disregard for the outcome of the victim constitute an intent to kill?" **Id.** at 39.

Because Appellant's ineffectiveness claim is predicated upon trial counsel's failure to object to a jury instruction, our analysis is guided by the well-settled principles pertaining to jury instructions.

> A trial court has broad discretion in formulating and delivering instructions to a jury. When reviewing the exercise of that discretion, an appellate court must evaluate the trial court's instruction as a whole to determine if it was fair or prejudicial. A trial court may use such language as it chooses, so long as the

- 31 -

law is clearly, adequately, and accurately presented to the jury for its consideration. We will not rigidly inspect a jury charge, finding reversible error for every technical inaccuracy, but rather evaluate whether the charge sufficiently and accurately apprises a lay jury of the law it must consider in rendering its decision. Error cannot be predicated on isolated excerpts of the charge, but it is the general effect of the charge that controls.

**Commonwealth v. Drummond**, 285 A.3d 625, 634-635 (Pa. 2022) (footnotes and quotation marks omitted), *cert. denied*, ___ S.Ct. ___, 2023 WL 2959478 (2023) (slip copy). It is well-established that a jury is presumed to follow a trial court's instructions. **Commonwealth v. Naranjo**, 53 A.3d 66, 71 (Pa. Super. 2012).

Here, the trial court's answer regarding the jury's question was as follows:

| [TRIAL COURT:] | The question reads: In committing a crime does the total disregard for the outcome of the victim constitute the intent to kill? |
| --- | --- |
| | Correct? |
| [JURY:] | Yes. |
| [TRIAL COURT:] | At the risk of repeating myself, as I said - and I don't mind. It's what I have to do. |
| | As I said earlier today, the word intent occupies a prominent space in the charge of the court when I talk about malice. In fact, when I defined, as you will recall, both first and third[-]degree murder, the only time the word intent is used in the definition of the essential elements for each of those offenses is in reference to the third element under first[-]degree |

murder, which requires specific intent to kill and with malice.

As I said, in talking about malice we're dealing with three states of mind: An intent to kill, an intent to inflict serious bodily harm or, thirdly, a conscious disregard of an unjustified and extremely high risk that his actions might cause death or serious bodily harm.

I also said that specific intent to kill, the first form of malicious state of mind under the law, is the type of finding that would satisfy under first[-]degree murder both malice and intent to kill. In other words, the finding of a specific intent to kill would satisfy the requirement of both the specific intent required and the malice required.

The other two examples of the state of mind the law considers bad enough to elevate a killing to murder is an intent to inflict serious bodily harm or the third, which I just defined starting with the words: A conscious disregard of an unjustified and extremely high risk.

You've asked a subjective question. You've asked basically whether or not under certain circumstances could a conscious disregard of an extremely high risk that what you're doing might cause death or serious bodily harm rise high enough in your analysis to be equivalent to a specific intent to kill.

That's a subjective question, not necessarily a factual question, although facts do have a bearing upon its resolution. The best I can tell you is that you will have to evaluate all the evidence in the case. You will have to understand that it is not by accident that when the law defines malice it specifically enumerates

an intent to kill, an intent to inflict serious bodily harm[,] and a conscious disregard as three separate and distinct categories. They can all result in a finding of malice[,] but they do not all result in a first[-]degree murder verdict.

Because when you're talking about, in terms of your question, the intent to kill, as I said in my charge earlier, considering the seriousness of first degree, what first[-]degree murder entails, the law requires in the intent aspect of that that at the time the killing act took place the law demands that it be shown beyond a reasonable doubt that at the time the killing act took place the killer intended to cause the end of the life of the person he struck.

I'm sure in your life experience in the application of common sense you can conceive of situations where you would conclude under the conscious disregard theory some circumstances where you might find that the person who was disregarding the risk desired the end of the life of the individual who was put at risk. And I'm sure you can conceive of situations where although someone was disregarding a high risk that [their]·actions might result in death you can condemn that but would not necessarily find that the person desired the end of the life of the person. So I say it's subjective.

I think it's significant that the law broke the malice down into three separate categories. **I am not going to tell you here and now that every factual circumstance in life that results in death under the conscious disregard is equivalent to a specific intent to kill but I'm not going to say that that's**

- 34 -

**impossible either.** That's an evaluative decision that you would have to make, as I said, because it's subjective looking at all the facts and circumstances in the case.

But I also think it's significant and relevant to that determination to remember that the law; not by accident, specifically set out as the first [] form of state of mind language with an intent to kill. And I think, contemplating the seriousness of the charge of first[-]degree murder, as I said a moment ago, they generally anticipate a finding where the fact-finder - that is you in this case - can conclude beyond a reasonable doubt at the time the blow was struck or the blows were struck that the result desired was the end of someone's life. That's what makes it first[-]degree murder as opposed to other types of homicide.

I don't know if that answers your question but I can't - part of what you have to do is subjective in analyzing or making inferences or conclusions from the evidence.

I'm not saying it is an impermissible exercise in logic to conclude that a disregard of the outcome is equivalent to an intent to kill. That's a possibility. That's one of the alternatives. Whether it rises that high or not, as I said, I think it's something you'll have to evaluate based upon how you interpret and evaluate and infer from the evidence.

I can't add much more than that. All I'm trying to point out is that it's instructive that the law did break malice down into three separate categories for the reasons I've stated. I don't know if that helps you.

N.T., 11/17/00, at 13-18 (emphasis added). The trial court later clarified its

response to the jury's question as follows:

> [TRIAL COURT:]     Before I let you go - I will acknowledge on the record this is *sua sponte*, without correspond[e]nce with the jury or either counsel.
>
> I have done some reflection about things that I've talked to you earlier about. Although I believe that - in answer to your last question I mean. I believe I gave you a correct statement of the law but in an abundance of caution I'm a little bit concerned that there's a possibility, however slight, that I might have caused some confusion or misled you in any way. So I want to make sure that we're, to quote Richard Nixon, perfectly clear.
>
> There's a phrase which is called murder generally. When we as attorneys refer to murder generally[,] we refer to a situation where someone has been charged with murder and the fact-finder, judge or jury, has basically two decisions relevant to that charge. They have to decide whether in fact a murder was committed and, if so, the second decision they make is whether - what degree of murder is involved.
>
> When you hear the phrase murder generally that's talking about murder without any specification or conclusion as of yet as to what degree may or may not be involved.
>
> In certain respects what has been put on the table for you is a determination of a murder generally case. Of course there's always the considerations - and I don't mean to pass over them lightly - even though there's been argument by counsel

about who caused - statements by counsel in their arguments about there's no question as to who caused the injuries. You still have to make a decision.

All that comes down to is that in a murder trial, for a killing to be murder the Commonwealth must establish, as I said earlier, someone has been unlawfully killed; that the person accused, the defendant, did the killing; and that the killing was done with malice. Malice is the general intent. Finding that is a prerequisite to a finding of murder. If there's a killing and there's no malice it's not murder. It's something else.

So once you make that initial decision you have to determine whether or not, was someone killed? The defendant - did the defendant, the person accused in this case, do the killing and was the killing with malice? That's where you bring to bear my earlier definition of malice. When you make your decision as to whether or not this killing was with malice, if you decide it was, that decision could be based on a finding by you beyond a reasonable doubt that the malice was grounded in an intent to kill on the part of the accused or it was grounded in an intent to cause physical harm or it was grounded in what I have been referring to, a finding that the accused acted with a conscious disregard of extremely high risk that his actions might cause death.

To establish murder in the first degree[,] the Commonwealth must also prove the defendant specifically intended to kill. Thus, in addition to the three requirements that you bring to bear on a finding of malice, the Commonwealth must also prove the specific intent, which

involves the concepts of premeditation and deliberation.

The job is made a little bit simpler because if you [] conclude beyond a reasonable doubt that there is malice and the malice is based upon an intent to kill, then you're in effect also already completing the second step, which for first[-]degree murder is a finding of specific intent to kill.

If, however, your finding of malice is based upon a finding beyond a reasonable doubt that the malice was based upon an intent to cause physical harm or was based upon the conscious disregard concept that I defined, then you have to go into a second step to determine whether or not there was proven beyond a reasonable doubt a specific intent to kill.

What you bring to bear on that issue is all the facts and circumstances and evidence in the case that would bear upon that specific decision.

The point I'm making is for a murder verdict there's basically two steps. You have to first determine if there's malice involved. If there's no malice involved[,] it is not murder[,] and you don't have to consider anything else.

If there is malice involved[,] then in order for first degree to be found you also have to find a specific intent to kill. A person has a specific intent to kill if he has a fully formed intent to kill and is conscious of his own intention.

A killing is with specific intent to kill if it is willful, deliberate[,] and premeditated. And, as I also indicated, premeditation does not require planning or previous thought of any particular length of time. It can occur quickly.

> I was just concerned[,] and I wanted to make sure I didn't run the risk of confusing or misleading you. Or maybe the only one that was confused was myself.

*Id.* at 19-24.

While Appellant characterizes the trial court's response to the jury question as "a simple 'yes'" answer, we find the trial court's response, and subsequent clarifying response, to be far from a simple "yes." *See* Appellant's Brief at 41, 42 (describing the trial court's response as a "short shrift answer of 'yes'"). Rather, the trial court informed the jury that its question was a "subjective question" that must be answered by the jury after consideration of the case-specific facts. N.T., 11/16/00, at 15. As the trial court aptly noted, in some instances a total disregard for the outcome of the victim may give rise to a finding of an intent to kill, and would, thus, constitute first-degree murder, when the person who totally disregarded the risk to the victim, desired to end the victim's life. *Id.* at 16. Alternatively, the trial court explained that a total disregard for the outcome of the victim may not rise to the level of "intent to kill," and would, thus, constitute, third-degree murder, when the person, who totally disregarded the risk to the victim, did not desire to end the victim's life. *Id.* As such, the trial court sufficiently and accurately appraised the jury of the law, and we discern no error in the trial court's instructions. Therefore, Appellant's ineffectiveness claim on this ground is without merit.

Next, Appellant raises a claim that trial counsel was ineffective for failing to request that an agreed upon curative instruction be provided to the jury before the start of deliberation and for failing to object to the trial court providing the curative instruction *sua sponte* during the deliberation process. Appellant's Brief at 44-48.

To place Appellant's ineffectiveness claim in context, during Appellant's trial and in response to a question by the Commonwealth whether Appellant had a bad temper his entire life, Appellant's brother responded, "No, it calmed down when he went to prison." N.T., 11/14/00, at 89. Trial counsel objected, and the trial court sustained the objection and indicated that trial counsel preserved the issue. *Id.* The following day, the trial court, *sua sponte* raised trial counsel's objection to the brother's testimony. N.T., 11/15/00, at 11. The trial court denied Appellant's request for a mistrial, but granted the request that a curative instruction be provided, stating that the curative instruction would be provided as part of the final charge. *Id.* at 12. The trial court, however, failed to provide the curative instruction as part of its instructions to the jury. N.T., 11/16/00, at 59-100. At the conclusion of its charge, the trial court asked counsel "if they [had] any additions or subtractions," to which Appellant's trial counsel did not raise the trial court's failure to provide the curative instruction regarding the brother's testimony. *Id.* at 100. During jury deliberations and in responding to questions presented by the jury, the trial court, *sua sponte*, provided the curative instruction as follows:

Before I [answer your question,] I also should remark – you may or may not recall but in an abundance of caution I feel I must mention this – that during the testimony of one of the witnesses, [Appellant's brother] I believe, when he was being asked questions generally falling within the category of, quote unquote, the temper of [Appellant], he mentioned basically – even though he wasn't asked he volunteered that [Appellant's] temper improved when he came out of prison. I struck that comment from the record.

I would ask you not to read anything into [the brother's response] one way or another due to the fact that [Appellant] may have been in prison at one time in his life. You must not regard that as any significant evidence because I struck it from the record. It should not enter into your deliberations in any way and it should not affect your evaluation of the issues in the case. Because it is not, as I said, evidence. You should not consider [Appellant] might be a person of either bad character or criminal tendencies from which you may infer something negative or guilt from him. Just totally ignore it as if it never happened.

. . .

I think the issue is clear in your minds that whatever that incident may have been in the past, it was totally irrelevant and immaterial and has nothing to do with anything involved in this case.

N.T., 11/17/00, at 2-3.

Here, Appellant asserts that trial counsel's failure to request the curative instruction before the start of jury deliberations and to object to the curative instruction being provided during deliberations prejudiced him because "[b]y giving this instruction during jury deliberations, [] the trial court actually emphasized to the jury that Appellant had previously been incarcerated for an unrelated incident." Appellant's Brief at 46. A finding that trial counsel's alleged ineffectiveness prejudiced Appellant would require us to ignore the well-established principle that a jury is presumed to follow a trial court's

instructions. **See Naranjo**, 53 A.3d at 71. We decline Appellant's invitation. The trial court, in providing the curative instruction, informed the jury that the comment had been struck from the record and that consideration of the statement should not enter the jury's deliberations. N.T., 11/17/00, at 2-3. The trial court clearly stated that the statement was "totally irrelevant and immaterial and has nothing to do with anything involved in this case." **Id.** at 3. Therefore, we presume that the jury followed the trial court's instruction and did not consider the content of the brother's statement in reaching its verdict. **See Naranjo**, 53 A.3d at 71. As such, the record supports the PCRA court's denial of Appellant's petition on this ground.

Next, Appellant contends that trial counsel was ineffective for failing to challenge the victim's cause of death, asserting that proof the death was caused by "head trauma," as stated in the medical examiner's notice of death, "would have corroborated [Appellant's] claims of innocence."[11] Appellant's Brief at 48-52. In support of his claim, Appellant asserts,

> A touchstone consideration for the jury in this case is whether the evidence indicates an intentional act specifically intended to cause death, or a course of gross recklessness which indicated disregard for whether death would occur. Indeed, this is the difference between first- and third-degree murder.

---

[11] As discussed *supra*, Appellant did not present a defense of innocence at trial but, rather, asserted that his role in the victim's death amounted only to third-degree murder. **See** N.T., 11/16/00 (stating, "I [(Appellant)] fully accept my responsibility. I'm not ducking and hiding behind no attorney and not accepting I was responsible").

. . .

> The Commonwealth was able to proffer a cause of death which was at odds with the medical records.[12]  More importantly, the proffered cause of death undercut the defense while the "head trauma" cause of death in the medical examiner's notice [of death] would have corroborated [Appellant's] claims of innocence. Had counsel aggressively challenged the cause of death, this course of action would have directly supported the defense and simultaneously undercut a keystone of the Commonwealth's case.

*Id.* at 50.

A review of the "medical examiner's notice and pronouncement of death" ("notice of death") demonstrates that the victim's cause of death was listed as "head trauma."  This cause of death was based upon the emergency room physician's assessment of the victim, upon his arrival at the hospital, as well as information provided by the EMS worker who transported the victim to the emergency room, and was not based upon an autopsy of the victim's body.[13]  The emergency room physician noted on the notice of death that the victim arrived at the hospital with "bruises on [his] chest, [an] old scar on

---

[12] Appellant contends that the medical examiner, who performed an autopsy of the victim and testified on behalf of the Commonwealth, stated that "the actual cause of death was asphyxiation due to water buildup in decedent's lungs caused by a seizure, to which he was predisposed because of 'prior injuries.'"  Appellant's Brief at 49, *citing* **Powell**, 956 A.2d at 415-416.

[13] As part of the notice of death, the treating emergency room physician noted, based upon, *inter alia*, information provided by the EMS worker, that it was reported the victim fell at 8:00 p.m., the victim could not be aroused at 9:30 p.m., Appellant initiated CPR, 911 emergency services received a call at 10:45 p.m. stating that the victim was unconscious, upon arrival of EMS the victim had no vitals and was unconscious, and the victim was transported to the emergency room where he was pronounced dead at 11:09 p.m.

[his] head, [a left] eyelid laceration, [and] pupils [that were] fixed and dilated."

The medical examiner who oversaw the autopsy of the victim and was admitted as an expert in the field of forensic pathology for the Commonwealth,[14] testified, at trial, to a reasonable degree of medical certainty that the victim's cause of death was due to "multiple blunt force injuries" and the manner of death was homicide.  N.T., 11/14/00, at 10, 23.  The medical examiner ruled the death a homicide because of the location of the injuries on the victim's body and the multiplicity of injuries, including "fresh" injures, all over the victim's body.  *Id.* at 55.

The autopsy revealed "more than ten [fresh] blows" or blunt force injuries to the victim's body, including injury to the victim's left upper eyelid, the left jaw-cheek region, the back of the head and neck, over the forehead, in the upper chest region, in the armpit and forearm regions, and to the victim's mouth, that were inflicted no more than 48 hours prior the victim's death.  *Id.* at 23.  In particular, the medical examiner testified that the victim suffered, *inter alia*, a "fresh" blunt force injury to the top of his head.  *Id.* at 20.  The "fresh" injury to the victim's skull and brain, coupled with prior, similar injuries to the victim's skull and brain, which were only detected as part of the autopsy, in the medical examiner's opinion, triggered the victim to

_____

[14] The medical examiner who testified at trial was not the same physician who examined the victim in the emergency room on November 20, 1997, and completed the notice of death form.

suffer a seizure on the day of death, which, in turn, caused the victim's lungs to fill with water and stopped the flow of oxygen to the victim's brain, thereby causing the victim to expire. *Id.* at 12-30. As such, the medical examiner's testimony that the victim's cause of death was due to a blunt force injury to the top of the victim's head was not inconsistent with the emergency room physician's assessment that the cause of death was "head trauma."

Our review of the cause of death testimony reveals that trial counsel pursued a reasonable trial strategy given the evidence of substantial injuries discovered on the victim's body and the fact that the cause of death listed on the notice of death was not inconsistent with the cause of death as explained by the Commonwealth's expert witness. For example, during cross-examination of the medical examiner, trial counsel sufficiently challenged the medical examiner's assessment that the fatal injuries to the victim's head were not caused by a fall or accident. As a result of this cross-examination, the medical examiner agreed that the victim's death was the "result of an accumulation of injuries [to the victim] over a time frame[.]" *Id.* at 41. The medical examiner further agreed that it was conceivable the injuries to the top of the victim's head were caused by "a baseball hitting [the victim] on the head." *Id.* at 40.

It was then within the purview of the jury to weigh the evidence and assess the credibility of the witnesses, such as the medical examiner, and believe all, some, or none of the testimony regarding the cause of death. As determined by our Supreme Court in *Powell*, *supra*, "[t]he evidence, when

- 45 -

viewed in the light most favorable to the Commonwealth as verdict winner, was sufficient to permit the jury to conclude, beyond a reasonable doubt, that [Appellant] intentionally, deliberately, and with pre-meditation killed [the victim]." *Powell*, 956 A.2d at 417.

Moreover, Appellant failed to demonstrate how he was prejudiced by trial counsel's alleged failure to challenge the cause of death by asserting that the cause of death was simply due to "head trauma." As discussed *supra*, the cause of death listed on the notice of death is not inconsistent with the cause of death as explained by the medical examiner who performed an autopsy on the victim. Both the notice of death and the medical examiner noted the fresh head trauma suffered by the victim, as well as fresh and healed injuries on the victim's body. As explained by the medical examiner, the fresh head trauma, coupled with prior injuries, led to the victim suffering a seizure that ultimately caused his death. In this context, focusing on head trauma as the cause of death would not have wholly corroborated a claim of innocence, nor was a strategy likely to diminish Appellant's level of criminal culpability in a meaningful way. As such, Appellant was not prejudiced by trial counsel's performance. Therefore, Appellant's ineffectiveness claim on this ground is without merit.

In his second issue, Appellant raises a claim that prior PCRA counsel was ineffective for failing to raise trial counsel's ineffectiveness regarding a challenge to the victim's cause of death. Appellant's Brief at 53-59. Appellant's assertion of prior PCRA counsel's ineffectiveness is belied by the

record. Both Attorney Stretton, in the first amended PCRA petition, and Attorney Kaufmann, the second amended PCRA petition, raised the claim that trial counsel was ineffective for failing to challenge the cause of death. **See** First Amended PCRA Petition, 12/31/18, at ¶17; **see also** Second Amended PCRA Petition, 1/31/21, at 8. Moreover, the PCRA court addressed this claim of trial counsel's ineffectiveness in its Rule 1925(a) opinion. PCRA Court Opinion, 6/30/22, at 13-15. As discussed *supra*, we concur with the PCRA court that a claim of trial counsel's ineffectiveness based on a failure to challenge the cause of death is without merit. Therefore, Appellant is not entitled to collateral relief based upon his allegations of PCRA counsel's ineffectiveness.[15]

_____

[15] To the extent that Appellant asserts the PCRA court erred in denying his petition without first conducting an evidentiary hearing, we find this claim to be without merit.

It is well-established that a "a petitioner is not entitled to a PCRA hearing as a matter of right[. T]he PCRA court can decline to hold a hearing if there is no genuine issue concerning any material fact and the petitioner is not entitled to post-conviction collateral relief, and no purpose would be served by any further proceedings." **Commonwealth v. Taylor**, 933 A.2d 1035, 1041 (Pa. Super. 2007), *appeal denied*, 951 A.2d 1163 (Pa. 2008); **see also** Pa.R.Crim.P. 907(1) (stating that, the PCRA court may dispose of a petition without a hearing when the PCRA court is "satisfied from [its] review that there are no genuine issues concerning any material fact and that the [petitioner] is not entitled to post-conviction collateral relief, and no purpose would be served by any further proceedings"). For the reasons discussed herein, we find Appellant failed to establish a colorable claim about which there remained a material issue of fact. Therefore, we discern no error of law or abuse of discretion in the PCRA court's decision to deny the petition without an evidentiary hearing.

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/8/2023